**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**

---

**RUBEN WILLS,**

Plaintiff,

vs.

**MICROGENICS CORPORATION,**
**THERMO FISHER SCIENTIFIC, INC.,**
**ACTING COMMISSIONER ANTHONY J.**
**ANNUCCI, AND SUPERINTENDENT**
**DELTA BAROMETRE, SUPERINTENDENT**
**FOR PROGRAMS MITCHELL,**
**LIEUTENANT MCCREY, LIEUTENANT**
**WOODBURY, AND CAPTAIN DOE,**

Defendants.

---

**AMENDED**
**COMPLAINT**

**Index No. 20-CV-4432**

Plaintiff Ruben Wills, by his attorney at Rickner PLLC, complaining of the Defendants, respectfully alleges the following:

### PRELIMINARY STATEMENT

1. Defendants Microgenics Corporation and Thermo Fisher Scientific, Inc. sold a urinalysis analyzer that repeatedly gave false positives, despite knowing that incarcerated persons in the State of New York would be penalized, and deprived of their liberty, when their defective device wrongly reported that people had used opiates, when in fact they had not. Plaintiff Ruben Wills' urine was tested by correction officers and an employee from Microgenics, falsely tested positive for opiates, and Wills was punished as a result. This was negligence and violated the duty of care owed to Plaintiff Ruben Wills. Further, these companies violated Wills' rights and committed the tort of malicious prosecution by falsely stating that their tests were not only accurate, but that they required no other confirmation using a more accurate

1

test, such as gas chromatography / mass spectrometry. This was exactly the opposite of what they reported to the Food and Drug Administration ("FDA") when seeking approval for their test.

2.      Compounding this error, New York State Department of Corrections and Community Supervision ("DOCCS") employees Acting Commissioner Anthony J. Annucci, Superintendent Delta Barometre, Superintendent for Programs Mitchell, Lieutenant McCrey, Lieutenant Woodbury, and Captain Doe violated Wills for having over the counter medication, despite it clearly stating in the handbook for Lincoln Correctional Facility, where Wills was held, that not only was over the counter medication permitted, he was specifically allowed to use it. As a result of the defective urinalysis test, and the wrongful violation for having over the counter medication, Wills lost his chance for parole, had his work release revoked, and was effectively reincarcerated for months, all in violation of his right to due process. He now brings claims for this unwarranted loss of liberty, and other injuries, against Defendants for their wrongful conduct.

## THE PARTIES

3.      Plaintiff Ruben Wills ("Plaintiff" or "Wills") is, and was at all times relevant to this action, a resident of the State of New York, and lives in the County of Queens. He is a former member of the New York City Counsel, representing the 28th District.

4.      Defendant Microgenics Corporation ("Microgenics") is a Delaware company that is based in Fremont, California, and which specializes in the development, manufacture, marketing, and sale of products relating to clinical diagnostics. Microgenics Corporation is a wholly owned corporate subsidiary of Defendant Thermo Fisher Scientific, Inc. In 2018,

Microgenics Corporation contracted with DOCCS to provide Indiko Plus urinalysis analyzers at 52 DOCCS facilities, and to install, maintain, and train DOCCS employees on those machines.

5.     Defendant Thermo Fisher Scientific, Inc. ("Thermo Scientific", together with Microgenics the "Microgenics Defendants") is a Delaware company that is based in Waltham, Massachusetts. Thermo Fisher Scientific, Inc. is the corporate parent company of Microgenics Corporation. Thermo Fisher Scientific markets itself as the manufacturer of the Indiko Plus urinalysis analyzers, as well as the owner of the assays used to conduct drug testing on those machines. Thermo Fisher Scientific is responsible for all FDA submissions made regarding the Indiko Plus urinalysis analyzers and assays used to conduct drug testing on those machines. For purposes of the contract with DOCCS, Microgenics is identified as doing business as Thermo Fisher Scientific.

6.     Defendant Acting Commissioner Anthony J. Annucci was the Acting Commissioner for all of DOCCS during the times relevant herein and he is sued in his original capacity.

7.     Superintendent Delta Barometre was a Superintendent at DOCCS Lincoln Correctional Facility during the times relevant herein and she is sued in her original capacity.

8.     Superintendent for Programs Mitchell, full name unknown, was a Superintendent at DOCCS Lincoln Correctional Facility during the times relevant herein and she is sued in her original capacity.

9.     Lieutenant McCrey, full name unknown, was a Lieutenant at DOCCS Lincoln Correctional Facility during the times relevant herein and is sued in their original capacity.

10.     Lieutenant Woodbury was a Lieutenant at DOCCS Lincoln Correctional Facility during the times relevant herein and is sued in their original capacity.

3

11.     Captain Doe, name unknown, was the Captain at DOCCS during the times relevant herein and he is sued in his original capacity.

12.     Acting Commissioner Annucci, Superintendent Barometre, Superintendent Mitchell, Lieutenant McCrey, Lieutenant Woodbury, and Captain Doe are referred to hein collectively as the "DOCCS Defendants".

## JURISDICTION AND VENUE

13.     This Court has original subject matter jurisdiction over Wills' federal claims pursuant to 28 U.S.C. §§ 1331 and 1343(a)(3) and (4) because the claims arise under laws of the United States, namely 42 U.S.C. §§ 1983 and 1988, and seek redress of the deprivation, under color of state law, of rights guaranteed by the United States Constitution.

14.     This Court has supplemental jurisdiction over Wills' state law claims pursuant to 28 U.S.C. § 1367(a) as they are part of the same case or controversy giving rise to the federal claims and share the name nucleus of operative facts as the federal claims.

15.     Venue in this case is based upon 28 U.S.C. § 1391(b)(3). The Eastern District of New York is the proper venue because it is the judicial district where the Plaintiff currently resides and where Defendants are subject to the Court's personal jurisdiction.

## JURY DEMAND

16.      Plaintiff respectfully demands a trial by jury of all issues in this matter pursuant to Fed. R. Civ. P. 38(b).

## STATEMENT OF FACTS COMMON TO ALL CLAIMS[1]

### *Drug Testing at DOCCS*

17.     Traditionally, the State of New York ran its own drug testing facilities, helmed by doctors who understood the tests they performed and how accurate those tests were.

18.     The State of New York evaluated testing options and made specific choices as to which tests would be used.

19.     The State of New York trained and supervised the employees performing these tests, ensuring that their own employees met the applicable standard.

20.     The State of New York also used its own scientists to provide testimony regarding the accuracy of drug tests, including urinalysis tests performed on incarcerated persons.

21.     For example, in the class action *Peranzo v. Coughlin*, 608 F. Supp. 1504, 1509 (S.D.N.Y. 1985), doctors from the New York State Substance Abuse Services Testing and Research Laboratory of Brooklyn testified that the double EMIT tests that they used at the time, a type of immunoassay, were 97% accurate (later in the litigation raised to 98% accurate) based on their own review of the literature and their own study of 800 tests that were subjected to double EMIT testing and then confirmed with a separate, more accurate test, likely gas chromatography / mass spectrometry.

22.     Ultimately, following this class action, the Second Circuit affirmed the district court's finding that 98% accuracy was sufficient to satisfy due process in a disciplinary hearing

---

[1] The allegations relating to urinalysis analyzers, the contract between Microgenics / Thermo Scientific and DOCCS, and the Indiko Plus system, are similar to the allegations in the putative class action, filed in the Eastern District of New York, *Steele-Warrick v. Microgenics Corporation, et al.*, 19 Civ. 6558 (VMS). Plaintiff's counsel has done a separate review of the available information, and confirmed that these allegations are well-supported, consistent with the obligations in Federal Rule of Civil Procedure 11. In addition, several additions have been made.

when an incarcerated person is accused of taking illegal drugs. *Peranzo v. Coughlin*, 850 F.2d 125, 126 (2d Cir. 1988).

23.     This standard was incorporated into DOCCS Directive 4937, which stated that two positive EMIT tests are together accurate enough to provide an evidentiary basis for discipline that is consistent with the requirements of the due process clause.

24.     More recently, however, the State of New York has outsourced the determination of which tests are appropriate, the training to provide those tests, and the testimony as to the accuracy of those tests, to private companies, including the Microgenics Defendants.

***Defendants Contracted with DOCCS to Provide Urinalysis Analyzers***

25.     In May 2018, the New York State Department of Correction and Community Supervision ("DOCCS") issued IFB 2018-06 seeking "reagent rentals of bench top urinalysis analyzer services to be used in its 52 correctional facilities for inmates," with a contract term of September 1, 2018 to August 31, 2023.

26.      Defendants submitted a bid in response to the Invitation for Bids on behalf of "Microgenics Corporation Part of Thermo Fisher Scientific."

27.     Microgenics is a wholly owned subsidiary of Thermo Fisher Scientific.

28.     The Microgenics Defendants' bid was submitted on Thermo Scientific letterhead.

29.     The web address identified by Microgenics on the bid was www.thermoscientific.com/diagnostics.

30.     The two individuals identified by Microgenics as "authorized to negotiate on its behalf regarding all matters pertaining to this bid" were sales representatives with email addresses ending with "@thermofisher.com."

31.     In attachments A and C to its bid, Microgenics submitted marketing materials for Thermo Fisher Scientific relating to its urinalysis systems.

32.     In attachment B to its bid, Microgenics submitted literature regarding "ThermoFisher Microgenics Reagant information."

33.     In the bid signature page, the Microgenics Defendants identified "Microgenics Corporation" as the "Legal Business Name of Company Bidding" and stated that Microgenics was "D/B/A - Doing Business As" "Thermo Fisher Scientific."

34.     In September 2018, DOCCS entered into a five-year contract, #CC161458, with the Microgenics Defendants (the "Contract") to provide Indiko Plus urinalysis analyzers and related services, including training and testimony regarding accuracy, for 52 correctional facilities in New York.

35.     The Indiko Plus urinalysis analyzer is an automated benchtop chemistry system that is marketed as a device to conduct urinalysis drug testing.

36.     The Indiko Plus urinalysis analyzer runs multiple tests, including the Microgenics Defendants' range of CEDIA immunoassays.

37.      Thermo Fisher Scientific is the manufacturer of the Indiko Plus urinalysis analyzer and the assays used in connection with that machine. It is responsible for the FDA submissions relating to both the machine and assays.

38.     The Indiko Plus urinalysis analyzer is sold and distributed by medical distributors across the country, including Microgenics.

39.     The Contract required the Microgenics Defendants to conduct onsite training at all 52 DOCCS facilities and to conduct a mandatory master trainer class so that DOCCS could

7

train and certify new testers. Defendants conducted such trainings and certified that DOCCS employees were proficient to operate Defendants' machines.

40.     The Contract required the Microgenics Defendants to provide support and maintenance for their urinalysis services, including unlimited 24/7 telephone support; preventative maintenance visits; 24-hour response time; repair, replacement, and maintenance of machines; helpdesk operations; user feedback procedures; and warranties, returns, and exchanges.

41.     The Contract required the Microgenics Defendants' employees to testify at disciplinary hearings for incarcerated individuals who received positive drug test results from the Indiko Plus machines.

42.     The Microgenics Defendants testified about the professed reliability of their testing at numerous disciplinary hearings in 2019-even when the tests had actually produced false positive results. DOCCS relied on the test results and the Microgenics Defendants' supporting testimony when disciplining incarcerated persons for positive drug tests.

43.     The Contract required that the Microgenics Defendants' products be "substantially uninterrupted or error-free in operation." It further required that the Microgenics Defendants warrant and represent that products delivered under the contract conform to the manufacturer's specifications, performance standards, and documentation.

44.     Both Microgenics and Thermo Fisher Scientific were responsible for providing services under the Contract, and both entities negligently provided such services, breaching their duty of care to Wills and causing him foreseeable harm.

***Defendants Failed to Comply with Applicable Standards and Their Test Results Were***
***Unreliable***

45.     DOCCS began to use the Indiko Plus urinalysis analyzers provided by

Microgenics at DOCCS's facilities in late 2018 or early 2019.

46.     As the entities responsible for providing drug testing services in DOCCS'

facilities (including machines, assays, services, training, installation, and maintenance), the

Microgenics Defendants owed incarcerated persons in those facilities a duty to abide by

applicable drug testing standards and to ensure that the testing was accurate and reliable. They

breached those duties.

47.     The Microgenics Defendants' standards for the Indiko Plus urinalysis analyzers

state that the machines should be used as an initial screen only, and confirmatory testing is

required to verify any positive result.

48.     In fact, in their 510(k) Premarket Notification to the FDA for the CEDIA

Buprenorphine II Assay ("Buprenorphine Assay") they go further and state that: "The assay

provides only a preliminary analytical test result. A more specific alternative chemical method

***must*** be used to obtain a confirmed analytical result. Gas chromatography/ mass spectrometry

(GC/MS) or Liquid chromatography/tandem mass spectrometry (LC-MS/MS) is the preferred

confirmatory method." (emphasis added).

49.     Despite these standards, the Microgenics Defendants negligently provided

products and services to DOCCS knowing that the results generated by the Indiko Plus urinalysis

analyzers would be used to discipline incarcerated persons without any confirmatory testing.

50.      The Microgenics Defendants negligently failed to inform DOCCS of the

applicable standards for the Indiko Plus urinalysis analyzers when negotiating the Contract and

providing its contracted products and services.

51.     The Microgenics Defendants negligently failed to train DOCCS employees on the applicable standards for the Indiko Plus urinalysis analyzers.

52.     The Microgenics Defendants' employees, pursuant to the companies' direction, negligently testified at disciplinary hearings that the results from the Indiko Plus urinalysis analyzers could be relied on as a basis for disciplining incarcerated individuals, even though they knew that the results were only preliminary screens.

53.     The Microgenics Defendants negligently failed to ensure that their products and services were used in accordance with applicable standards even though they had full control over the nature of the use.

54.     The Microgenics Defendants knew that positive drug screen results from the Indiko Plus urinalysis analyzers would be used to discipline individuals in DOCCS' custody- without verification by an outside laboratory using gas chromatography or any other verification method-and they did nothing to stop such discipline from being imposed. On the contrary, Defendants' employees supported and endorsed such use.

55.     Nothing in the Contract required DOCCS to verify the Microgenics Defendants' drug test results through an outside laboratory using gas chromatography or any other method prior to disciplining incarcerated persons. In fact, they negligently failed to determine whether their testing had the same level of accuracy as the EMIT tests, which had been used by DOCCS for several decades.

56.     Not only did the Microgenics Defendants negligently fail to abide by applicable standards, they were also negligent in failing to ensure that the Indiko Plus urinalysis analyzers produced accurate preliminary drug test screens.

57.     Contrary to the Microgenics Defendants' representations that their services would be error-free, they failed to ensure that their machines and assays functioned properly, resulting in widespread cross-reactivity issues that caused thousands of false positive results for Suboxone/buprenorphine, AB Pinaca, opiates, and THC.

58.     The error rate for these tests was far higher than any acceptable scientific test. The State of New York, according to the recent bid to replace the Microgenics Defendants' products, tests roughly 500 incarcerated people a month. According to documents leaked to online news source Gothamist, 2,000 incarcerated people were affected by the defective testing.

59.     A significant number, if not the vast majority, of the false positives were for Suboxone/buprenorphine, based on the Buprenorphine Assay.

60.     The Microgenics Defendants also deviated from the applicable standard of care by representing that the Buprenorphine Assay, when used the same way as the older EMIT testing, was as accurate (i.e. 98%). It is vital that the accuracy, the sensitivity, and the specificity of the test is reported correctly, because without knowing this information it is impossible to properly interpret the test.

61.     The cross-reactivity issues that ensued were the direct result of the Microgenics Defendants' negligence in their installation, training, and maintenance of the machines.

62.     Further, the Microgenics Defendants continued to testify at disciplinary hearings that their test results were reliable even though they should have known that there were serious reliability concerns-especially given the sheer number of incarcerated persons reporting false results.

63.     In particular, it should have been apparent that having many incarcerated people, with no history of opiate abuse, testing positive for a drug, Suboxone/buprenorphine, which is rarely taken recreationally, was an aberration.

64.     In fact, buprenorphine is most commonly available as a component of Suboxone, which is a combination of buprenorphine and naloxone. Suboxone is used to deter opiate abuse because the buprenorphine binds to the opioid receptors, and has a mild effect, preventing cravings for other opioids, while the naloxone helps prevent abuse by counteracting any euphoric effects if someone takes multiple doses of Suboxone.

65.     Ultimately, DOCCS determined that the positive results generated by Indiko Plus urinalysis analyzers were so unreliable that it reversed the disciplinary decisions for every positive result for Suboxone/buprenorphine, AB Pinaca, Opiates, and THC generated by the machines in 2019. Wills, however, still faces a higher level of scrutiny while on parole, and must make more visits to his parole officer, as a result of the disciplinary actions detailed herein.

66.     DOCCS's decision to overturn every positive result for these substances indicates the magnitude of the issue.

67.     In November 2019, DOCCS changed their police to now require a confirmatory test using GC/MS, or similar method, before instituting discipline.

68.     In January 2020, DOCCS terminated its contract with the Microgenics Defendants for cause, based on the Microgenics Defendants' failure to comply with the terms and conditions of the Contract.

69.     DOCCS officials and the New York State Inspector General are both investigating the Microgenics Defendants given the rampant and voluminous unreliable and false positive test results.

12

70.     On February 28, 2020, DOCCS sued the Microgenics Defendants in New York State Supreme Court, County of Albany, alleging that their equipment, products, procedures, and services were inadequate and deficient, failed to operate according to their intended use, and produced false positive test results.

71.     The natural and foreseeable consequence of the Microgenics Defendants' negligent failure to ensure that its products and services complied with applicable standards and produced accurate results was that thousands of incarcerated persons were punished for false and unreliable positive drug tests, including Wills.

***The Indiko Plus Buprenorphine Assay Produces a False Positive for "Buprenorphine II"***

72.     Ruben Wills was formerly incarcerated in Marcy Correctional Facility and Hudson Correctional Facility, among other facilities. As a politician and former elected official, he was a particularly high-profile incarcerated person.

73.     Wills was granted Temporary Work Release and moved on or about July 2018 from Hudson Correctional Facility to Lincoln ("Lincoln") Correctional Facility in New York City. Lincoln is far less restrictive and allowed Wills to work in the community, and soon be released on parole with far fewer restrictions on his liberty.

74.     At Lincoln, Wills specifically told medical staff that he needed over the counter medication for his allergies, and he was told he was allowed to take this medication.

75.     In addition, the Lincoln Offenders Orientation Manual stated specifically that "You can take over the counter medications (OTC)".

76.     As he began to transition back into the community, Wills was extremely careful to follow all DOCCS rules and procedures, to ensure he would be permitted to begin living at home

13

as soon as possible. On September 20, 2018, Wills sought approval to work for a plumbing supply company, and his request was granted on October 3, 2018.

77.     Prior to the false positive at issue herein, Wills had never tested positive for any drug. Further, he had no history of drug abuse whatsoever.

78.     Wills was active in assisting other incarcerated persons with grievances, particularly then they had been denied furlough or DOCCS employees had discouraged employers from hiring incarcerated people, which made it more difficult for them to move to less restrictive facilities, and he was targeted by correction officers as a result.

79.     On January 26, 2019, Lt. Woodberry wrongfully issued an "Inmate Misbehavior Report," claiming that wills was in possession of an expired New York State benefit card, his marriage license, an expired driver's license, the title to a car Wills owned, his marriage certificate, his birth certificate, a bank statement, and two electric bills.

80.     Lt. Woodberry stated falsely that these were contraband. They were not, and no rule or regulation prohibited Wills from possessing any of these items.

81.     In fact, Wills had been specifically instructed to bring his expired license and his expired benefit card to give to his Offender Rehabilitation Coordinator.

82.     After missing several days of work, and being forced to defend himself against these charges, DOCCS found that he had not violated any rules and Wills was not disciplined further.

83.     On March 13, 2019, Wills was issued a Notification of Earned Eligibility Determination, which qualified him to be released on parole.

84.     On or about March 28, 2019, before Wills was released, he was given a random urine screening using the Microgenics Defendants' Indiko Plus urinalysis analyzer.

85.     The Indiko Plus machine returned a false positive test for "Buprenorphine II" using the Buprenorphine Assay.

86.     The Microgenics Defendants were directly involved in this testing because a representative from one of the companies was at Lincoln, training a DOCCS employee, using the test on Wills' urine.

87.     It was apparent that the results were not accurate, given that Wills had absolutely no history of drug use, had never had a positive test on any other urinalysis test, and buprenorphine is most commonly used as a component of Suboxone, a drug used to combat opiate addiction. The drug is almost never abused recreationally, and the only persons who would likely use it are opiate addicts looking to control the symptoms of their addiction. But the Microgenics Defendants had so thoroughly convinced DOCCS that their tests were accurate, they could not be convinced otherwise.

88.     On March 29, 2019, Wills' attorney contacted Superintendent Delta Barometre, demanding second test using another method, such as a hair sample. This request was refused because, on information and belief, the Microgenics Defendants had specifically instructed DOCCS that the Indiko Plus urinalysis analyzer did not require a second test using another method for accuracy.

89.     On March 30, 2019, at a disciplinary hearing at Lincoln, a disposition was rendered against Wills based solely on the fact that Indiko Plus urinalysis analyzer, using the Buprenorphine Assay, produced a positive test for "Buprenorphine II", and that the testing was performed by a certified urinalysis tester that was, on information and belief, trained by the Microgenics Defendants.

90.     Wills was given 30 days keeplock, suspended for 60 days, and a referral to the Temporary Release Committee. Wills immediately appealed to Superintendent Barometre, along with making a Freedom of Information Request for information regarding the urinalysis.

91.     On April 1, 2019, Wills mentioned to Superintendent for Programs Mitchell that Benadryl may have caused the false positive. Wills was in fact mistaken. Benadryl does not cause the Buprenorphine Assay to report a false positive.

92.     On April 2, 2019 was removed from eligibility for presumptive parole.

93.     On April 3, 2019, correction officers searched Wills locker and found pills which a facility nurse confirmed were Benadryl – an over the counter medication that Wills was specifically told he was permitted to take.

94.     Wills was issued a violation on April 5, 2019 by Lieutenant McCrey.

95.     At an April 8, 2019 hearing Lieutenant Woodberry found that Wills had violated the rules at Lincoln Correctional Facility by having Benadryl, even though those rules made it clear he was in fact permitted to take this medication.

96.     On April 9, 2019, after Wills appealed, Captain Doe upheld Lieutenant Woodberry's decision.

97.     Wills again wrote to Superintendent Barometre, who had the authority to dismiss the violation, on April 9, 2019, but she refused to correct her subordinates clear mistake.

98.     On April 9, 2019, the Temporary Release Committee determined that he should be removed from the program, and Wills was transferred to Sing Sing Correctional Facility, and later Walkill Correctional Facility.

99.     As a result of a pre-existing injury, Wills could not safely travel in the vans and buses DOCCS typically used. This injury was well-known to DOCCS and had been the subject

16

of numerous prior grievances. Due to the rough ride back to Walkill, Wills developed internal bleeding and a serious bacterial infection.

100.    After Wills' supporters attempted to intervene, Acting Commissioner Annucci, who supervised all of DOCCS, personally reviewed the case and confirmed the disciplinary decision, by letter on April 12, 2019. In that letter, he stated that the Microgenics' Defendants tests were a "primary" and not a preliminary test, relying on the Microgenics' Defendants' false representations.

101.    In all determinations, the DOCCS Defendants' relied on the Microgenics Defendants' false statements about the accuracy of the testing, and the quality of the training, and decided that if the Indiko Plus using Buprenorphine Assay produced two positive results on the same sample, no other test was necessary before disciplining Wills.

102.    On May 7, 2019, Wills' Earned Eligibility Determination was revoked.

103.    Wills appealed all these determinations, explaining in detail that the Handbook he had been given authorized the use of over the counter medications and that the positive test results could not possible be accurate, but the appeals were denied.

104.    Wills reapplied for Temporary Work Release, but his application was denied.

105.    Wills was finally released on August 12, 2019, months later than he should have been.

**FIRST CLAIM FOR RELIEF**
**(NEGLIGENCE AGAINST THE MICROGENICS DEFENDANTS)**

106.    Plaintiff incorporates by reference the allegations set forth in all preceding paragraphs as if fully set forth herein.

107.    Plaintiff received a false positive drug test results while in DOCCS' custody, resulting in him being removed from Temporary Work Release, returned to prison at Sing Sing

17

Correctional Facility and Walkill Correctional Facility. He would have been granted parole on April 2, 2019, but instead was incarcerated more than 4 months longer.

108.    The Microgenics Defendants owed a duty to Plaintiff to ensure that the Indiko Plus urinalysis analyzers were used in accordance with applicable standards and produced accurate and reliable test results.

109.    The Microgenics Defendants breached their duty to Plaintiff by failing to ensure that the Indiko Plus urinalysis analyzers yielded accurate and reliable test results; entering a contract for use of the Indiko Plus urinalysis analyzers that was inconsistent with applicable standards; failing to train DOCCS employees on applicable standards for using the Indiko Plus urinalysis analyzers; and testifying at disciplinary hearings that the results generated by Indiko Plus urinalysis analyzers could be relied on for discipline, when Defendants knew that the results were a preliminary screen only.

110.    The Microgenics Defendants knew that DOCCS was relying on test results from the Indiko Plus urinalysis analyzers to discipline individuals in its custody, and it was reasonably foreseeable to the Microgenics Defendants that their failure to ensure accurate and reliable test results and that the Indiko Plus urinalysis analyzers were used in a manner consistent with applicable standards would result in unjust discipline of those individuals and the naturally foreseeable adverse consequences of such discipline.

111.    The Microgenics Defendants are therefore liable for Plaintiff's injuries under the tort of negligence, including but not limited to his loss of liberty, emotional and physical pain and suffering caused by the extended incarceration, and humiliation at being falsely accused of being an illegal drug user.

## SECOND CLAIM FOR RELIEF
### (42 U.S.C § 1983 DUE PROCESS VIOLATION
### AGAINST THE MICROGENICS DEFENDANTS)

112.    Plaintiff incorporates by reference the allegations set forth in all preceding

paragraphs as if fully set forth herein.

113.    The Microgenics Defendants contracted with the State of New York to perform

several functions traditionally performed by the State, including choosing which tests to employ

to test for illicit drug use, training DOCCS employees to perform the tests, and testifying (and

otherwise providing information) regarding how accurate the tests are.

114.    It was the explicit policy of the Microgenics Defendants to affirmatively

represent, both to DOCCS and in disciplinary hearings, that two Buprenorphine Assay tests

using the Indiko Plus Analyzer were as accurate as two EMIT tests, the method DOCCS had

used for decades prior.

115.    Further, it was the explicit policy of the Microgenics Defendants to affirmatively

represent, both to DOCCS and in disciplinary hearings, that the two Buprenorphine Assay tests

using the Indiko Plus Analyzer were sufficient and no other confirmatory testing was needed.

116.    Based on the Microgenics Defendants representations to DOCCS, the two

Buprenorphine Assay tests using the Indiko Plus Analyzer were used to discipline incarcerated

persons, including Wills.

117.    These representations were false. In fact, in their applications to the FDA, Thermo

Fischer and Microgenics stated that the Buprenorphine Assay results must be confirmed using

gas chromatography / mass spectrometry.

118.    These false statements thus violated Wills' right to due process.

119.    The Microgenics Defendants are therefore liable for Plaintiff's injuries under 42

U.S.C § 1983, including but not limited to his loss of liberty, emotional and physical pain and

suffering caused by the extended incarceration, and humiliation at being falsely accused of being an illegal drug user.

**THIRD CLAIM FOR RELIEF**
**(42 U.S.C § 1983 DUE PROCESS VIOLATION**
**AGAINST THE DOCCS DEFENDANTS)**

120.    Plaintiff incorporates by reference the allegations set forth in all preceding paragraphs as if fully set forth herein.

121.    Plaintiff was told explicitly that he was permitted to take over the counter medication, like Benadryl, but was then punished precisely because he took Benadryl.

122.    By punishing Plaintiff for doing something he was specifically authorized him to do, Defendants Acting Commissioner Annucci, Superintendent Barometre, Superintendent for Programs Mitchell, Lieutenant, Lieutenant Woodbury, and Captain Doe violated Plaintiff's due process rights under the Fourteenth Amendment of the United States Constitution, actionable under 42 U.S.C § 1983.

123.    These Defendants are therefore liable for Plaintiff's injuries, including but not limited to his loss of liberty, and emotional and physical pain and suffering caused by the extended incarceration.

**WHEREFORE**, Plaintiff Ruben Wills demands the following relief against Defendants Microgenics Corporation, Thermo Fisher Scientific, Inc., Acting Commissioner Anthony J. Annucci, Superintendent Delta Barometre, Superintendent for Programs Mitchell, Lieutenant McCrey, Lieutenant Woodbury, and Captain Doe:

     a.    Compensatory damages;

     b.    Punitive damages;

     c.    The convening and empaneling of a jury to consider the merits of the claims herein;

    d.   Costs and interest and attorney's fees;

    e.   Such other and further relief as this court may deem appropriate and equitable.

Dated: New York, New York
       September 21, 2020

Rickner PLLC

By:        /s/

        Rob Rickner

233 Broadway Suite 2220
New York, New York 10279
Phone: (212) 965-9370
Fax: (888) 390-5401
*Attorney for Plaintiff*