# EXHIBIT 1

| | | TITLE | NO. 4937 |
|---|---|---|---|
| NEW YORK STATE Corrections and Community Supervision **DIRECTIVE** | | Urinalysis Testing | DATE 12/27/2018 |
| SUPERSEDES DIR. #4937; Dated 10/03/2017 | DISTRIBUTION A B | PAGES PAGE 1 OF 10 | DATE LAST REVISED |
| REFERENCES (Include but are not limited to) 7NYCRR, Part 1020 | APPROVING AUTHORITY *[signature] James A. O'Gorman* | | |

**I. POLICY**: Urinalysis test procedures shall be used to verify whether or not an inmate has used drugs and may be used to verify whether or not an inmate has used alcohol.

**II. DESCRIPTION**: This directive outlines the procedures to be followed by each facility in the administration of inmate urinalysis testing.

**III. BACKGROUND**: The use by inmates of illicit drugs and alcohol presents a serious threat to the safety and security of a correctional facility. Urinalysis testing of inmates can be an effective means by which to detect and discipline inmates who use illicit drugs or alcohol. Aggressive and consistent urinalysis testing will be one of many components of a program to ensure a drug-free environment within the Department's facilities.

**IV. PROCEDURE**: Urinalysis testing of inmates shall be conducted as set forth below:

   A. <u>Reasons for Testing</u>

      1. When correctional staff has reason to believe the inmate has used drugs or alcohol, and/or the inmate is alleged to have been involved in an act of violent misconduct;

      2. When the inmate is found to be in possession of suspected illicit drugs or alcohol or associated paraphernalia, or when these are detected or found in an area controlled, occupied, or inhabited by the inmate;

      3. When the inmate is observed to be in possession of or using illicit drugs or alcohol, but correctional staff are unable to obtain a sample of the substance;

      4. When correctional staff receive information from a source that the inmate is currently under the influence of, or has recently used, illicit drugs or alcohol;

      5. When an inmate returns late from, or on a random or routine basis when the inmate returns from:

         a. A furlough, work release, or other Temporary Release Program;

         b. Community service; or

         c. An outside work detail;

      6. Prior to and after an inmate participates in a Family Reunion Program visit;

      7. As part of a computer-generated program for random testing of all inmates;

      8. As part of a computer-generated program for random testing of inmates who have been found guilty of drug or alcohol related misconduct in the previous one-year period; and

9. A Watch Commander or higher authority may also order inmates to be tested as part of a random urinalysis testing program on any identifiable unit of the facility, or any identifiable program area, or on any identifiable group of inmates. A random urinalysis testing program shall not be used for the purpose of harassing or intimidating any inmate.

B. Identifying the Inmate to be Tested: The inmate for whom a urinalysis test is requested shall be identified by an employee and reported to a Lieutenant or higher authority, and each urinalysis test shall be approved by the Lieutenant or higher authority and documented on Form #2082, "Request for Urinalysis."

NOTE: In facilities where Sergeants serve as Watch Commanders, such Sergeants may approve the urinalysis test.

C. Ordering the Inmate to be Tested: The inmate ordered to submit a urine specimen for urinalysis testing shall be informed of the underlying reason (whether suspicion, routine, or random) why he or she is being ordered to submit the specimen. If the inmate refuses to submit the specimen, he or she shall be informed that this refusal constitutes a violation of facility rules and that he or she may incur the same disciplinary disposition that a positive urinalysis result could have supported. The resultant Misbehavior Report shall indicate that the inmate was informed of the above.

D. Obtaining the Urine Specimen

1. The inmate shall be escorted or shall report to the facility hospital, clinic, or other appropriate area.

2. Security or medical staff shall hand to the inmate the specimen bottle, labeled with the inmate's name and number, the date, and any other relevant identifying information. This information shall be typed or written in indelible ink.

   The inmate shall be asked to acknowledge that the information on the label is correct. The inmate shall also be asked if he or she has been taking any medication in the past month, and the inmate's response shall be noted on Form #2082. If the inmate's response is "yes" and the subsequent test results are positive, an inquiry shall be made to medical personnel as to what medications the inmate has received in the past month which may lead to a positive result.

3. Security or medical staff shall ensure that the inmate submits an unadulterated urine specimen in the specimen bottle provided by witnessing the inmate urinate into the bottle. The inmate must be pat frisked prior to submitting the urine specimen, and he or she may be required to wash hands, or wear gloves, to further ensure that the specimen submitted is that of the inmate. The foregoing shall be conducted by security or medical staff of the same sex, in private, and outside the presence of other inmates or staff.

   Female inmates may be required to urinate into a urine collector or an unused plastic cup, rather than the specimen bottle itself. The contents of the collector or the cup shall then be transferred to the specimen bottle by the inmate, or by the witnessing staff person in the presence of the inmate.

4. If the inmate is unable to provide a urine specimen immediately, he or she shall be detained until he or she is able to provide a urine specimen. Drinking water should be available in an amount not to exceed eight ounces per hour.

    An inmate who is unable to provide a urine specimen within three hours of being ordered to do so shall be considered to be refusing to submit the specimen.

    The inmate shall be informed that this refusal constitutes a violation of facility rules and that he or she may incur the same disciplinary disposition that a positive urinalysis result could have supported. The resultant Misbehavior Report shall indicate that the inmate was informed of the above.

    NOTE: Inmates participating in an approved religious fast should not be required to provide a urine sample during fasting periods, since consumption of water may be necessary. Sample requests should be scheduled during other periods of the day and normal urinalysis testing procedures should then apply, including offering water to those inmates unable to provide a urine sample.

5. The staff person witnessing the submission of the specimen by the inmate shall make the appropriate notation on Form #2082.

    If the inmate is unable within three hours of being ordered or if the inmate refuses to submit a urine specimen, this fact shall be noted on Form #2082.

E. <u>Procedure for Inmates Claiming to be Unable to Urinate in Presence of Others</u>: The following procedures shall be employed when there is reasonable belief that the inmate is unable to provide a urine specimen due to an alleged inability to urinate in the presence of others (shy bladder). Reasonable belief is based upon the following criteria, including, but not limited to:

- A review of the Statewide Special Accommodation list by the Superintendent, Deputy Superintendent for Security (DSS), Captain, or Lieutenant to ascertain whether the particular inmate is listed on the "I-M_Spec_urinalysis_Accom" list in the shared drive folder.
- Prior disciplinary (FIDS) data indicating a history of urinalysis testing violations, if applicable, and/or computerized urinalysis testing (KDTS) data indicating if the inmate has provided a urine sample in the past with or without the use of alternate processes.
- Any medical or mental health records supporting the inmate's claim (records to be reviewed by Health Services and/or OMH staff (see Form #4937D, "Medical/Mental Health Records Review for Inmates Claiming to be Unable to Provide a Urine Sample Under Staff Observation").
- The inmate's behavior and demeanor at the time of request for the urine sample.

1. Authorization: The Watch Commander shall be notified by the staff member assigned to obtain the urine sample and provide verbal authorization for these procedures.
2. Location: The procedure shall take place in temporary isolation, in the facility drug watch cell/room or other appropriate area.
3. Procedure

    a. The inmate shall be strip frisked (to be recorded on Form #1140, "Report of Strip Search or Strip Frisk"), subject to a metal detector search, and given a

        gown or other garment to wear prior to placement in the drug watch cell/room and will be required to wash their hands or wear gloves to further ensure that the sample is unadulterated. The cell/room shall be thoroughly searched prior to admission of the inmate and, if applicable, the water supply to the cell/room shall be turned off.

    b.    Security staff shall hand to the inmate the specimen container, labeled with the inmate's name and number, the date, and any other relevant identifying information consistent with the provisions of Section IV-D-2 of this directive. Staff shall not witness the inmate urinate into the specimen container.

    c.    The inmate shall be detained until he or she is able to provide a urine specimen for up to three hours including any time prior to a determination that special arrangements are necessary. Drinking water should be made available in an amount not to exceed eight ounces per hour. Water given to the inmate shall be consumed under the direct observation of staff. The inmate shall not be allowed to retain any amount of water.

    d.    An inmate who is unable to provide a urine specimen within three hours of the initial order to produce a sample shall be considered to be refusing to submit the specimen and a written Misbehavior Report citing the inmate with charge 180.14, noting that the procedures listed above in Section IV-E-3 were followed.

F.    <u>Report of Special Accommodations</u>: Whenever an inmate has been approved by a facility for a special urinalysis accommodation, an Outlook e-mail will be sent by the DSS (or functional Equivalent in those facilities without a DSS) to Doccs.sm.SpecialHousing with the following information, utilizing the format listed below:

| **Inmate's DIN** | |
|---|---|
| **Inmate's Name** | |
| **Facility Name** | *Originating facility* |
| **Date of Request** | *i.e., Date the inmate requests the special accommodations* |
| **Reason for Special Accommodations** | *i.e., medical, shy bladder syndrome* |

Facility Superintendents, DSSs, Captains, and Lieutenants may access the Statewide list through the Facility Operations shared drive in the folder: "I-M_Spec_urinalysis_Accom."

G. <u>Process the Urine Specimen</u>
   1. If the facility has a urinalysis testing apparatus:
      a. All persons handling the specimen shall be noted under "Chain of Custody" on Form #2082. The number of persons handling the specimen shall be kept to a minimum. The specimen shall be kept in a secure area at all times.
      b. Place the specimen in a secured refrigerator, if it is not to be tested immediately. If it is anticipated that the specimen will not be tested within one day, it is recommended that the specimen be stored frozen. A logbook shall be kept in the vicinity of the refrigerator/freezer, and each person accessing the specimens shall note his or her name, the date, and the time of each such access.
      c. The individual performing the urinalysis testing shall have been appropriately trained in the use of the testing apparatus, and shall precisely follow procedures recommended by the manufacturer for the operation of the testing apparatus.
      d. If a positive result is obtained on the first test, the procedures followed and the results obtained shall be noted by the operator on Form #2083.1, "Urinalysis Procedure Form." A second test shall be performed on the same sample.

         The results of the second test shall be noted on a second Form #2083.1.

         If a positive result is obtained from the second test, the individual performing the urinalysis testing shall cause a Misbehavior Report to be issued. The inmate's copy of the Misbehavior Report shall be accompanied by Form #2082 and Form #2083.1, the inmate's printed results produced by the urinalysis testing apparatus for the positive tests, and a statement of the scientific principles and validity of the testing apparatus (use Attachment A).
      e. If a negative test result is obtained on the second test, the specimen shall be considered negative and no Misbehavior Report shall be written.
   2. If the facility does not have its own urinalysis testing apparatus, the specimen may be forwarded to an independent laboratory or to another facility that has a urinalysis testing apparatus.
      a. Place the specimen in a secured refrigerator/freezer, if it is not to be forwarded immediately. All persons handling the specimen shall be noted on Form #2082. The number of persons handling the specimen shall be kept to a minimum. A logbook shall be kept in the vicinity of the refrigerator/freezer, and each person accessing the specimens shall note his or her name, the date, and the time of such access.
      b. Forward the specimen in accordance with procedures recommended by the testing laboratory or facility.

  c. If a positive result is obtained, an Inmate Misbehavior Report shall be issued. The inmate's copy of the Misbehavior Report shall be accompanied with [Form #2082](), the inmate's test report from the laboratory or facility, and a copy of the methods and procedures used by the testing laboratory or facility and a statement of the scientific principles and validity of the testing apparatus used by the laboratory or facility.

**V.** **USE OF RESULTS**: In a subsequent disciplinary proceeding, a positive urinalysis result may be used as evidence of the illicit use by the inmate of the drug or alcohol indicated by the result. The record of the disciplinary proceeding must include [Form #2082]() and:

 A. [Form #2083.1](), any printed documents produced by the urinalysis testing apparatus, and the appropriate statement of the scientific principles and validity of the testing apparatus (see Attachment A), if the facility has an urinalysis testing apparatus; or

 B. The report of the testing laboratory or facility, a copy of the methods and procedures used by the testing laboratory or facility, and a statement of the scientific principles and validity of the testing apparatus used by the laboratory or facility, if a laboratory or another facility is used.

**VI.** **STATISTICAL DATA**: All results obtained in the course of the Urinalysis Testing Program shall be entered on the computerized drug testing system.

**VII.** **REQUIRED PARTICIPATION IN PROFICIENCY TESTING**: Each facility shall enroll in the Urine Toxicology Proficiency Testing Service of the American Association of Bioanalysts, 205 West Levee, Brownsville, Texas 78520.

## EMIT or DRI+ CEDIA Drug Detection System

The EMIT (Enzyme Multiplied Immunoassay Technique) or DRI+ CEDIA (Cloned Enzyme Donor Immunoassay) Drug Detection System consists of instrumentation, accessories, and reagents for detecting drugs of abuse in body fluids.  These tests were designed as a primary screening system to detect positive samples in a given population.  A negative result is strong evidence that the drug in question is not present in excess of the Reagent detection limit.

The EMIT or DRI+ CEDIA Reagents are qualitative.  They are not designed to measure the quantity of drug in a sample, but will distinguish a positive from a negative sample.

The EMIT or DRI+ CEDIA Reagents are based on a biochemical principle (homogenous enzyme immunoassay).  EMIT or DRI+ CEDIA Reagents are utilized as quantitative for therapeutic drug monitoring, and semi-quantitative and qualitative results for drugs of abuse.

The EMIT or DRI+ CEDIA System is an automated analyzer for drug of abuse urine screening designed to perform all functions necessary for running EMIT or DRI+ CEDIA Reagents.

The reaction rate of the cut-off calibrator serves as the reference point for determining sample results.  A sample is considered positive if its reaction rate is equal to or greater than that of the cut-off calibrator.  Negative and high calibrator/controls are run to validate reagent and instrument performance.  Urine samples are mixed with two reagents.  The system automatically measures and mixes samples and reagents.  Photometric absorbance readings are taken on reagent reactions.  The system computer interprets operator input, processes reagent data, and interprets results.

## Limitations

A. All reagents must be stored as directed.  Storage conditions will affect the stability of the reagents, controls, and calibrator.  Stability is optimal when all are stored refrigerated.  Length of stability time diminishes as storage temperature increases.

B. Urine samples may be collected in plastic or glass containers.  If not tested within one day, it is recommended that urine samples be stored frozen.  Samples not thus frozen may produce a "false negative;" However, in no event will the failure to freeze a sample result in a "false positive."  The effect of urine preservatives has not been established; therefore, it is recommended that urine preservatives not be used.

C. The reagent has not been designed for use with body fluids other than urine.

D. The EMIT or DRI+ CEDIA Drug Detection Systems perform optimally when operated within a temperature range of 15-32 degrees C (59-90 degrees F).  All performance claims are based on testing done in this temperature range.  Temperatures outside this range may result in decreased reagent sensitivity.

E. The EMIT or DRI+ CEDIA System is optimized for use with the EMIT or DRI+ CEDIA Reagents.  Performance of the EMIT System with other reagents has not been established.

## Critical Parameters

### Reagents

1. Temperature of the reagents should not exceed 32 degrees C (90 degrees F) for extended periods.
2. Discolored reagents should be discarded.
3. For each test, use reagent vials that have the same lot number and that have been stored under the same conditions.

### Instrumentation

1. The performance of the instrument and reagents should be checked periodically by running the negative and high calibrator/control with the cut-off calibrator. The EMIT System solution should be filled up as needed.
2. At the beginning of each working day, several procedures are required to ensure proper operation of the instrument and accurate calibration and sample testing. The system solution requires sufficient fill level, and the system should be primed.
3. The EMIT System may be left on at all times. If there is a need to turn it off, the operator would then need to wait until the cooling compartment is completely cooled. Then the system will indicate when ready.

### Materials

Allow all samples stored in the freezer to completely thaw before use. The EMIT or DRI+ CEDIA System performs optimally when operated within a temperature range of 15-32 degrees C (59-90 degrees F).

## Reliability

EMIT and DRI+ CEDIA tests have been shown to be among the most consistently accurate drug testing methods in current use.

### EMIT

The Centers for Disease Control in Atlanta, Georgia, conducted drug abuse proficiency testing surveys from 1972 to 1981. The surveys assessed the reliability of drug testing performed by different analytical methods in laboratories throughout the country.

In the most recently published data from the 1980 surveys, the percentages of correct results obtained with EMIT tests ranged from 97% (for amphetamines, barbiturates, morphine, and phencyclidine) to 99% (for cocaine and methadone). The percentages obtained with gas chromatography methods ranged from 95% to 99%, and with thin-layer chromatography, from 92% to 97%.

A study was performed for Syva by an independent laboratory using GC/MS for all samples parallel with the EMIT marijuana Assay. Analyzing 100 urine samples by both methods, the EMIT did not give a single false positive result. False negative results may occur due to the lower sensitivity of the EMIT tests than the GC/MS sensitivity. In legal cases, however, false negative is an error that is to the advantage of the accused.

## **CEDIA**

1. DRI+ and CEDIA Reagents are currently used by the largest reference lab in the country; the Federal Probation and Parole; Department of Defense; as well as numerous other state prisons, hospitals, drug courts, and treatment programs.

2. "All immunoassays (CEDIA, EMIT, RIA) performed equivalently for cocaine, opiates, and phencyclidine. The CEDIAs for all the major drugs of abuse are reliable and effective for large-volume urine screening programs." Reference: Cloned enzyme donor immunoassay (CEDIA) for drugs-of-abuse screening Armbruster D.A., Hubster E.C., Kaufman M.S., Ramon M.K. (1995) *Clinical Chemistry*, 41 (1), pp. 92-98.

## **Abstract**

1. Background

   For analysis of urine samples during abstinence control for driving ability assessment (medical and psychological assessment, MPA), a reliable screening method for ethyl glucuronide and drugs of abuse (cannabinoids, opiates, cocaine, amphetamines, methadone, and benzodiazepines) is needed.

2. Methods

   In this study CEDIA and DRI+ immunoassays were applied on a Thermo Fisher Scientific Indiko Plus analyzer, Precision and accuracy as well as sensitivity and specificity at the required cut-offs for the MPA were evaluated.

3. Results

   The specificity was satisfactory and ranged from 91% for methamphetamine to 100% for opiates, cocaine metabolite, amphetamine, EDDP, and benzodiazepines. Moreover, sensitivity was 100% for all assays except for cannabinoids (91%).

4. Conclusion

   The presented method can therefore be recommended for abstinence control.

Kohler, K.; Hammer, R.; Riedy, K.; Auwarter, V.; Neukamm, M. (2016, June 27). Evaluation of CEDIA and DRI Drugs of Abuse Immunoassays for Urine Screening on a Thermo Indiko Plus Analyzer, Journal of Clinical Laboratory Analysis, 31 (1).

"DRI Reagents are acceptable alternatives to EMIT Reagents for the analysis of amphetamines, cannabinoids, cocaine metabolite, opiates, and phencyclidine in urine on the Cobas Mira analyzer. Utilization of DRI Reagents for more than 12 months demonstrated the reliability of the reagents and allowed cost comparison." Reference: Broussard, LA.; Hanson, L. (1997, March 1). Evaluation of DRI enzyme immunoassays for drugs-of-abuse screening on the Cobas Mira, *Clin Lab Sci.* 10 (2), pp. 83-86.

## Enzyme Immunoassay Case Law

In its decision dated October 26, 1987, in the federal class action suit of <u>Peranzo et al. v. Coughlin, et al</u>., the Southern District of New York found that "with a 98+% rate of accuracy, the double EMIT testing as performed by DOCCS is sufficiently reliable so that the use of the results as evidence, even as the only evidence, in a disciplinary hearing does not offend due process." The Court relied upon DOCCS' record of 98.7% accuracy rate in proficiency testing with the American Association of Bioanalysts over the past four years.

There is no test method, including the EMIT method, that can offer 100% confidence in the accuracy of its results. This is because a very small number of urine samples can be expected to produce unusual results due to differences in their composition, handling, storage, or testing.

Syva is the only drug test manufacturer to express its product accuracy in statistical terms, and they are the only manufacturer to guarantee such a high level of confidence in the accuracy of its test results. Before they ship test kits from a newly-manufactured lot, their Quality Control Department uses the new product to test urine samples containing drug and samples containing no drugs. It commonly obtains correct results for more than 99% of the samples it tests.

Over-the-counter medication with very similar chemical structures may sometimes produce positive results for amphetamine. These medications are listed in the product literature.