# EXHIBIT C

Case 1:20-cv-04432-BMC-VMS   Document 104-4   Filed 02/05/24   Page 1 of 14 PageID #: 1185

Page 1

```
 1    UNITED STATES DISTRICT COURT
      EASTERN DISTRICT OF NEW YORK
 2    ----------------------------------------------X
 3    RUBEN WILLS,
 4                        Plaintiffs,
 5                                   Case No:
         - against -            20-cv-04432 BMC-VMS
 6
      MICROGENICS CORPORATION, THERMO FISHER SCIENTIFIC,
 7    INC., ACTING COMMISSIONER ANTHONY J. ANNUCCI, AND
      SUPERINTENDENT DELTA BAROMETRE, SUPERINTENDENT FOR
 8    PROGRAMS MITCHELL, LIEUTENANT MCCREY, LIEUTENANT
      WOODBURY, CAPTAIN DOE,
 9
                          Defendants.
10
      ----------------------------------------------X
11
12
                        April 24, 2023
13                      9:32 a.m.
14
15
16
17
18
19       VIRTUAL DEPOSITION OF RUBEN WILLS, a Plaintiff,
20
21    pursuant to Notice, taken at the above date and
22
23    time, before MARIA ACOCELLA, a Notary Public within
24
25    and for the State of New York.
```

Page 30

```
 1              Ruben Wills
 2   until I was convicted.
 3         I was incarcerated two weeks
 4   after the conviction.
 5      Q.   And you also mentioned that you
 6   had a not-for-profit that you were --
 7         What was your position for the
 8   not-for-profit that you established?
 9      A.   Founder and executive director.
10      Q.   And what were your duties as
11   founder and executive director?
12      A.   Because it was really just me and
13   a group of volunteers, so promotion,
14   organizing, securing budgets.
15      Q.   And what did the not-for-profit
16   do?  What was the mission?
17      A.   We dealt with the disparity and
18   inequities that single mothers had to deal
19   with:  Healthcare, different types of
20   insurance knowledge, child care, early child
21   care education, things like that.
22      Q.   Is that not-for-profit still in
23   existence?
24      A.   No.
25      Q.   How many --
```

Page 31

```
 1              Ruben Wills
 2      A.   It is still in existence; we just
 3   don't operate it.
 4         Technically, on paper, it is
 5   still in existence.
 6      Q.   Approximately how many volunteers
 7   or individuals did you supervise as founder
 8   and executive for the nonprofit?
 9      A.   It would fluctuate.
10      Q.   Where did you get the funding for
11   that specific not-for-profit?
12      A.   Most of it came from me.
13      Q.   When you say from you, what do
14   you mean by that?
15      A.   Personally, I funded most of it.
16      Q.   Okay.  Mr. Wills, you are no
17   longer incarcerated, correct?
18      A.   No, ma'am.
19      Q.   And how long were you in state
20   custody?
21      A.   Two years.
22      Q.   And when you approximately --
23   when you say two years, approximately, what
24   years are you referring to?
25      A.   2017 until 2019.
```

Page 32

```
 1              Ruben Wills
 2      Q.   And when you entered the DOCCS
 3   system, were you provided an inmate behavior
 4   handbook?
 5      A.   Yes.
 6      Q.   Okay.
 7      A.   When you're saying DOCCS, are we
 8   talking about state DOCCS or city DOCCS?
 9      Q.   When I say DOCCS, from this point
10   on I am actually referring to the New York
11   State Department of Corrections and Community
12   Service?
13      A.   Yes, I was.
14      Q.   And what kind of information did
15   the inmate handbook contain?
16      A.   Rules and procedures things that
17   were acceptable, things that were not
18   acceptable.
19      Q.   Was there any information in that
20   handbook related to unauthorized medication?
21      A.   That would be the second
22   handbook.
23      Q.   When you say the second handbook,
24   what do you mean by that?
25      A.   The first book that we received
```

Page 33

```
 1              Ruben Wills
 2   when we enter DOCCS is a smaller handbook,
 3   something like five by five, and it gives
 4   outlines and procedures.
 5         When you enter the temporary work
 6   release, they give you a larger book, which
 7   is eight and a half by eleven; I don't know
 8   the exact amount of pages, maybe 40 pages.
 9   And that book outlines unauthorized
10   medication or over-the-counter medication.
11         MS. DEDUSHI:  One moment, please.
12         THE WITNESS:  Sure.
13         MS. DEDUSHI:  I am just looking
14      for something.  Bear with me, Mr. Wills.
15         THE WITNESS:  No problem.
16         MS. DEDUSHI:  One second.  I will
17      be sharing a document with you.
18         Does anyone know how to -- I
19      thought I -- usually it is on the bottom
20      to share a document, right, Mr. Rickner,
21      since you seem to be --
22         MR. RICKNER:  It depends on who
23      the host is.
24         MS. MEKLES:  Off the record.
25         (Discussion off the record at
```

Page 34

```
 1            Ruben Wills
 2   10:07 a.m. and back on the record at
 3   10:08 a.m.)
 4         MS. DEDUSHI:  Okay.
 5   Q.   So I will be sharing the screen,
 6 Mr. Wills.  I will be showing you what will
 7 be marked as Defendant's Exhibit A by the
 8 court reporter.  I will scroll down and give
 9 you an opportunity to look at it.  Just let
10 me know when I can move to the next page,
11 okay?
12         MR. RICKNER:  Can we please put
13     the Bates range on the record, since
14     this looks like it is a partial
15     document.
16         MS. DEDUSHI:  I will absolutely,
17     towards the end, as he is reviewing it.
18   A.   Yes, you can scroll.
19         (Whereupon, a document was marked
20     as Defendant's Exhibit A for
21     identification, as of this date.)
22   Q.   Did you have the opportunity to
23 review the first page?
24   A.   Yes.  You can scroll, there is
25 nothing on that.  All right.  Okay.
```

Page 35

```
 1            Ruben Wills
 2   Q.   So far, from looking at this
 3 document -- I apologize.  Does looking at
 4 only these pages, does this document look
 5 familiar to you?
 6   A.   Yes.  I just can't tell if it
 7 is -- this is the --
 8   Q.   I can keep scrolling down, if
 9 that helps.
10         MR. RICKNER:  Why don't you
11     scroll to the tab for medication, which
12     I would imagine my client will
13     recognize.
14         MS. DEDUSHI:  Yes, one second.
15   Q.   But as you can see, these pages
16 are smaller, I think are copied -- I think
17 they are copied, as you can see, in one full
18 page, but they are different -- they are
19 smaller pages.
20   A.   Yes.
21   Q.   So I am going to scroll down.
22         Is this the -- is this the
23 document that you were referring to, which is
24 you said the small book that you received
25 once you entered into custody of DOCCS, the
```

Page 36

```
 1            Ruben Wills
 2 inmate handbook?
 3   A.   I believe it is the smaller book,
 4 yes.
 5   Q.   And how do you recognize it to be
 6 the smaller book?
 7   A.   The printing just looks different
 8 from what I remember than the larger book.
 9         Can you scroll back up a little
10 bit, so I can see the top of the page?
11   Q.   Sure.
12   A.   On this particular page.
13   Q.   Sure.
14   A.   No.  No.  I didn't mean all the
15 way back to the top of the --
16   Q.   Okay.
17   A.   I just meant that particular page
18 you were on.
19   Q.   Okay.  Then one second.
20   A.   So it would be the next page.
21         Yes, right there.  I need to see
22 the top of this page.
23   Q.   Sure.
24   A.   I believe this is the first one
25 that we received.
```

Page 37

```
 1            Ruben Wills
 2   Q.   Okay.  But if you look at -- if
 3 you look at this page, which is State
 4 Defendant -- Bates Number State Defendant
 5 000965, does it contain any information
 6 related to unauthorized medication?
 7   A.   Yes, 113.14.
 8   Q.   In the handbook, when you first
 9 entered DOCCS, and you received the inmate
10 behavior handbook, it did contain information
11 regarding unauthorized medication, correct?
12   A.   Yes.
13         MS. DEDUSHI:  I am going to stop
14     sharing.
15   Q.   What facilities were you housed
16 while incarcerated by DOCCS?
17   A.   I was housed at Downstate.  I was
18 housed at Marcy Correctional.  These are all
19 correctional facilities.
20         Do I have to say Downstate
21 Correctional Facility, Marcy Correctional
22 Facility?
23   Q.   You know, say it in a way that it
24 is clear what you mean.
25   A.   I was housed at Downstate
```

Page 38

1         Ruben Wills
2  Correctional Facility.  I was housed at Marcy
3  Correctional Facility.  I was housed at
4  Ulster Correctional Facility.  I was housed
5  at Sing Sing Correctional Facility.  I was
6  housed at Hudson Correctional Facility.  I
7  was housed a Lincoln Correctional Facility.
8      Q.   Okay.  Where were you housed in
9  2018?
10     A.   2018, I was housed at Downstate
11 Correctional Facility, and then transferred
12 to Marcy Correctional Facility, which was the
13 only facility.
14     Q.   So 2018, you were in Marcy
15 Correctional Facility from Downstate?
16     A.   Yes.
17     Q.   Were you at Marcy the entire of
18 2018?
19     A.   I was incarcerated in August
20 12th, so I didn't get to Marcy until
21 September, I believe 13th, or thereabouts,
22 and I stayed there for the finishing of the
23 year.  Is that what you are asking?
24     Q.   Yes.  I guess I am just trying to
25 figure out where you were in 2018, which

Page 39

1         Ruben Wills
2  facility?
3      A.   Yes.
4      Q.   But you said you were in
5  Downstate initially in 2018?
6      A.   Yes.  And then they transferred
7  me to Marcy, and there were two or three
8  trips that I was in Ulster Correctional
9  Facility for transfers back and forth to the
10 city.
11     Q.   And when you were transferred to
12 each facility that you mentioned, did you
13 receive an orientation related to that
14 specific facility regarding rules and
15 regulations?
16     A.   No.
17     Q.   Which facility did you not
18 receive orientation?
19     A.   Ulster, because that is a
20 reception transfer facility.
21          And I did receive -- actually, I
22 did not receive an orientation at Marcy.
23     Q.   And you also mentioned that you
24 were in -- or am I wrong -- did you say
25 Hudson, or am I wrong about that?

Page 40

1         Ruben Wills
2      A.   No, that is correct.  Hudson was
3  a temporary work release facility.
4      Q.   And where -- and when were you in
5  Hudson Correctional Facility?
6      A.   I want to say April of 2018 until
7  September, October of 2019 -- I mean 2018 --
8  I mean 2019, I am sorry.
9          No, I am wrong.  I was
10 incarcerated in 2017 August of 2017.  I went
11 to Downstate, and in September of 2017, I
12 went to Marcy Correctional Facility.
13     Q.   Okay.
14     A.   And in October or November of
15 2017, I had two transfers back and forth
16 through Ulster.
17          I stayed in Marcy until April --
18 I believe the date was in April of 2018.
19          And in 2018 I was transferred to
20 Hudson Correctional Facility for industrial
21 training.  I believe those are the correct
22 dates.
23     Q.   Okay.
24     A.   Or approximate dates.
25     Q.   Did you receive an orientation,

Page 41

1         Ruben Wills
2  then, when you were transferred to Hudson
3  Correctional Facility, which you said you
4  were there from April of 2018 until
5  September, October of 2018?
6      A.   Yes.
7      Q.   Were you handed over any
8  documents as part of that orientation at that
9  facility?
10     A.   Yes, I believe so.
11     Q.   What were those documents?
12     A.   Rules and guidelines for
13 temporary work release facility.
14     Q.   And did you also receive an
15 orientation in relation to the temporary work
16 aspect?
17     A.   No.  No.
18     Q.   And where were you transferred
19 after your housing at Hudson Correctional
20 Facility?
21     A.   To Lincoln Correctional Facility
22 for actual work release.
23     Q.   Okay.  And would you say that was
24 sometime in September, October of 2018,
25 'cause you said you were at Hudson from April

11 (Pages 38 - 41)

Page 58

1  Ruben Wills
2  work release, did you ever get to the point
3  where you were out seven days a week?
4      A.   No. I was actually, I believe
5  within seven days of going seven and zero.
6          And seven days of me being going
7  before my parole board I had a presumptuous
8  release, which is a paper board, and I was
9  cleared by the ORC and the superintendent up
10 to that point. I was supposed to go seven
11 and zero within those few days.
12     Q.   When you were at Lincoln
13 Correctional Facility, and when you first
14 started the program, which days were you out
15 in the community on furlough, and which days
16 did you have to stay at the facility?
17         Or if you don't remember the
18 dates, if you can just explain to me how many
19 days you were out in the community and how
20 many days you were in facility?
21     A.   I don't remember the dates, but
22 because I lived on Long Island, and it was
23 outside of a certain radius, they give you 30
24 days to find or secure employment in the work
25 release program.

Page 59

1  Ruben Wills
2          And after the 30 days, if you do
3  not, you have to go back for reassessment to
4  show that you have been diligently looking.
5  Or they can extend your time or they can send
6  you back upstate to permanent corrections.
7      Q.   I apologize, Mr. Wills. My
8  question was how many days, when you
9  started -- when were you transferred to
10 Lincoln Correctional Facility, my question
11 was how many days were you out on furlough
12 and how many days you were in the facility?
13     A.   That is what I was trying to
14 explain, because prior to that, you asked me
15 about certain nuances and privileges.
16         But in the beginning, I was
17 allowed to be out four nights a week because
18 of that, and three nights I had to come into
19 the program.
20         I believe the nights that I had
21 to come in was Tuesday -- Monday, Tuesday and
22 Wednesday nights, or Tuesday, Wednesday and
23 Thursday nights, in the beginning.
24     Q.   And when you were out on
25 furlough, who did you live with?

Page 60

1  Ruben Wills
2      A.   Oh, friends.
3      Q.   Which friends?
4      A.   Jamel Rivers and Taquana
5  (phonetic) Rivers. They are husband wife.
6      Q.   And where was -- where was their
7  home located at?
8      A.   You want the town, or the exact
9  address?
10     Q.   You can give me the town.
11     A.   Freeport, Long Island.
12     Q.   And did your stay with these
13 individuals have to be approved by DOCCS?
14     A.   Yes.
15     Q.   And how would they get approved?
16     A.   A parole officer would have to
17 visit the home prior to me getting approval
18 to be there. And once the home is found
19 acceptable, then DOCCS -- the parole officer
20 would let the facility know, and then they
21 would start your contract to be able to go
22 out then.
23     Q.   And did you have to sign a
24 memorandum of agreement as a result of the
25 temporary work release at Lincoln

Page 61

1  Ruben Wills
2  Correctional Facility?
3      A.   Say that again. I am sorry. Can
4  you repeat that?
5      Q.   Did you have to sign any kind of
6  memorandum of agreement as part of the
7  temporary work release, where you would
8  accept all the rules and regulations related
9  to work release while you were on furlough
10 and while you were in temporary work release?
11     A.   Again, I don't know if it was
12 necessarily an MOA. I know it was contract,
13 though.
14     Q.   And while you were on furlough,
15 did you secure an employment?
16     A.   Yes.
17     Q.   And what was the job that you
18 secured?
19     A.   I was an assistant vendor
20 specialist, I believe, at a local plumbing
21 supply.
22     Q.   What was -- did you remember the
23 name of the company?
24     A.   C&G, Charles and George.
25         I am just giving you the

Page 82

Ruben Wills

Like there is nothing you can do. You just stay in your dorm. There is no -- what is the name -- except going to the roof or going to eat, there are no privileges in the facility, so I am not sure what you mean by that.

Q. I guess I should say that you were still in the same housing area; none of that changed as a result?

A. No. They don't place you in restrictive housing, no.

Q. But you said the hold was placed on your temporary work release; is that correct?

A. Yes.

Q. Did you appeal the disciplinary decision after March of 2019?

A. Yes.

Q. Did you appeal it yourself, or did you have an attorney do it?

A. Actually, my attorney wrote into the superintendent and told them that we -- I would volunteer for a urine or blood test which would be -- I mean a hair or blood

Page 83

Ruben Wills

test, which would be more conclusive to prove that I wasn't on drugs.

And the superintendent didn't answer for a few days.

In the interim, I did put in -- prior to that, I put in an appeal for -- yes.

Q. So when did you -- do you remember the date you appealed it, and what was the result?

A. I appealed it, I believe on April 1st, and the result was a non-answer. Yeah, it was a non-answer.

I then spoke to the deputy superintendent the same day, and she said she received the appeal. They would look over the appeal, and then they would get back to me.

But nobody ever said anything about -- nobody actually wrote me back about the appeal until much later.

Q. I guess my question was, what was the conclusion of the appeal? That is really what I am asking.

Was it granted; was it denied?

Page 84

Ruben Wills

A. See, that is where I have the issue with the question, because the actual conclusion of the appeal, it was denied.

But it was denied after everything had already been done, after I already had a temporary work release committee and was removed from Lincoln.

Q. Did there come a time that that disciplinary disposition was reversed?

A. No.

Q. Okay. Were you taking any medications during the time that you provided the urine sample in March of 2019?

A. Yes.

Q. Which medications were you taking?

A. The medications that I had been prescribed through DOCCS, and over-the-counter medication, Benadryl.

Q. And do you remember, was Benadryl prescribed to you by DOCCS during that time?

A. No, it is over-the-counter.

Q. And so are you saying that that over-the-counter, the medication at Lincoln

Page 85

Ruben Wills

Correctional Facility was not prescribed by medical?

A. No. It didn't need to be.

Q. And could you buy the Benadryl over-the-counter medication at commissary at Lincoln Correctional Facility?

A. There was no commissary at Lincoln. There is vending machines downstairs.

Q. What about the prescribed medication? Do you remember which prescribed medication you were taking in March of 2019?

A. Something for my bladder. I don't remember the name. It was to control the spasms in my bladder. Nonaspirin aspirin, Prilosec. I think it is called Prilosec, and something else.

Q. When you say Prilosec, that is used for stomach issues?

A. Yes.

Q. I am going to direct your attention now to April 8th of 2019.

Were you still incarcerated at Lincoln Correctional Facility at that time?

22 (Pages 82 - 85)

Page 94

Ruben Wills

would be it would cause a reaction. There would be no other problems, because the rules clearly stated you can have over-the-counter medication.

Q. But there is a difference between the rules stating you can take medication while on furlough and the difference between that and possessing it within the facility without prescription?

A. No. They didn't have a distinction. They told us we can have it.

And being that they allowed me to bring it in, if not, they have would taken it. They would have disposed of it or written me up at that point, because that wasn't the first time I had Benadryl.

Q. Who is this nurse that told you you could have Benadryl without prescription?

A. I don't remember her name. I don't remember her name, but she was the only nurse that was there.

Q. So you're saying -- but we reviewed the inmate handbook earlier, correct?

Page 95

Ruben Wills

A. That is the original handbook when you are first incarcerated, yes.

Q. And aren't you told you are supposed to abide by those rules the entire time that you are incarcerated by DOCCS?

A. Until you get to a temporary work release, which has a different handbook that is approved by DOCCS, and that supersedes the regular handbook.

Q. So are you saying that the inmate handbook that was provided to you cannot -- does not -- did not -- is not in effect when you are in temporary work release; is that what you are saying?

A. No. What I am saying, when they give you the secondary handbook, some of those rules are written specifically tailored to the program. So there are certain colors you cannot wear while you are upstate, but you can wear those colors when you are going back and forth to work, because you are in temporary work release. That is a rule that is changed when you are in temporary work release.

Page 96

Ruben Wills

The over-the-counter medication is something that is changed. There are rules that are codified and supersede, tailored to that particular program.

Q. Did you have a disciplinary hearing related to your April 4, 2019 misbehavior report?

A. Yes.

Q. And was that on April 8th of 2019?

A. I am not sure about the date.

Q. Who was the hearing officer for this disciplinary hearing?

A. I want to say Lieutenant Woodbury.

Q. And did you plead guilty or not guilty for this misbehavior report?

A. Not guilty.

Q. Did you ask for any specific witnesses for your hearing for this misbehavior report?

A. Yes. In the beginning, I believe, of that hearing, I did ask for a bunch of witnesses and a bunch of directives

Page 97

Ruben Wills

and things.

Q. And did Ms. Woodbury grant you the ability to speak to those witnesses?

A. Yes.

But something that happened in the hearing to which made me not go through with the witnesses portion. I am not sure what it was. I don't remember that.

Q. So she granted you -- she was gonna provide you with the witnesses, but you then changed your mind; is that correct?

A. Yes. Something occurred which made me change my mind.

Q. So the witnesses did not testify; is that correct?

A. Yes, that is correct.

Q. Did you testify during this hearing?

A. Yes, I did.

Q. And was the testimony you gave at this disciplinary hearing true and accurate?

A. Yes, ma'am.

Q. Did Ms. Woodbury give you an opportunity to ask questions during the

25 (Pages 94 - 97)

Page 98

1      Ruben Wills
2  hearing?
3     A.   Yes, Lieutenant Woodbury did.
4     Q.   Did the hearing officer
5  essentially or eventually issue a decision on
6  this misbehavior report?
7     A.   Yes.
8     Q.   And what was the disposition?
9     A.   Not guilty on the smuggling
10 because of the rules stated, but she found me
11 guilty on the unauthorized medication, which
12 I did not understand.
13    Q.   Was that for Benadryl?
14    A.   Yes. I believe, yes. Because
15 that is the only thing that was in dispute.
16    Q.   And did she tell you why she
17 found you guilty, even though you say you did
18 not understand?
19        MR. RICKNER: Objection.
20        You can answer.
21    A.   I have no idea. I still don't
22 know why.
23    Q.   Did she read the decision on the
24 record? Did she tell you orally as to the
25 basis for her decision?

Page 99

1      Ruben Wills
2     A.   Yes, because I signed the
3  disposition, and I repeated it.
4        And I think if my repeating is
5  when she said that the Benadryl was
6  allowable.
7     Q.   So you're saying that she found
8  you guilty of possessing unauthorized
9  Benadryl, but she said that it was allowed?
10    A.   Unauthorized medication is the
11 actually charge; and from what I remember,
12 yes. I could go back, but I do remember
13 that.
14    Q.   Were sanctions imposed as a
15 result of this guilty disposition?
16    A.   Yeah. She gave me 15 days, no
17 rec.
18    Q.   And when you say 15 days of no
19 rec, were you actually involved in any
20 recreation at Lincoln Correctional Facility
21 at that time?
22        MR. RICKNER: Objection.
23    A.   No. I was already confined to
24 the floor.
25        The only rec -- the only rec they

Page 100

1      Ruben Wills
2  had at Lincoln was a small rooftop area where
3  everybody went to smoke, so I barely went up
4  there anyway.
5     Q.   During this disciplinary hearing,
6  did you at any point talk about, discuss with
7  Ms. Woodbury, the Lincoln orientation manual
8  that you were referring during this
9  deposition?
10    A.   Yes. Yes. Lieutenant Woodbury,
11 I did speak to her during the manual, yes. I
12 spoke to multiple people.
13    Q.   During the hearing, what, if
14 anything, did you tell her about the Lincoln
15 orientation manual that you are now talking
16 about?
17    A.   I said the rules clearly state
18 that it's allowable.
19    Q.   Did you appeal this disciplinary
20 hearing disposition at any point?
21    A.   Yes, I did.
22    Q.   And did you appeal it yourself,
23 or did you have an attorney do it?
24    A.   I appealed it myself, because
25 they told me that an attorney was not allowed

Page 101

1      Ruben Wills
2  to help with that tier of disciplinary, after
3  my attorney tried to help the first time.
4        And I was told that my first
5  appeal was too technical, and that I should
6  appeal this time, dealing with my record
7  while in the facility: Never missing any
8  check-ins, home check-ins, job check-ins,
9  never missing dates of coming back into the
10 facility, so things like that.
11       So that is what I did the second
12 appeal on.
13    Q.   And what was the ultimate result
14 of the appeal? Was it denied or was it
15 granted?
16    A.   It was denied.
17    Q.   Now, did you know Lieutenant
18 Woodbury before your April 8, 2019
19 disciplinary hearing?
20    A.   Yes. She was a lieutenant in the
21 facility the whole time.
22       She was actually the lieutenant
23 that told the CO at the bubble to let me know
24 why I was being placed on hold.
25    Q.   Did you have any interactions

Page 102

1  Ruben Wills
2  prior to April 8th of 2019 with Lieutenant
3  Woodbury?
4     A.  Yes.  She was a hearing examiner
5  at the first hearing I had.
6     Q.  Okay.  After the April 8th of
7  2019 disciplinary hearing, did you have any
8  interactions with Lieutenant Woodbury?
9     A.  Not that I know of.  Not that I
10 remember.
11    Q.  Did you have a temporary work
12 release hearing after the March and April of
13 2019 disciplinary disposition?
14    A.  Yes, I did.
15    Q.  When was that hearing?
16    A.  I don't remember the exact date.
17    Q.  Was it shortly after your
18 April 8, 2019 disciplinary hearing?
19    A.  Yeah.  Very shortly afterwards,
20 which was surprising.
21    Q.  Was the hearing scheduled at
22 Lincoln Correctional Facility?
23    A.  Yes, ma'am.
24    Q.  How were you notified of that
25 hearing?

Page 103

1  Ruben Wills
2     A.  I believe my ORC told me.
3     Q.  Do you know who, if anyone,
4  referred you to that hearing?
5     A.  I had to be referred.
6        I would believe it was -- oh.
7     Q.  When you say believe?
8     A.  When I say believe, I am not
9  sure.  I don't want to say something -- I
10 don't want to be called a liar later.  I
11 don't know.
12       I believe it was Lieutenant Heini
13 (phonetic), the first hearing officer that
14 referred it.  I am not sure, though.
15    Q.  Who was this hearing in front of?
16    A.  Oh, the new ORC, which was
17 strange.  The dep superintendent and someone
18 from security I believe, one of the COs.
19    Q.  Is it fair to say that they were
20 part of the temporary release committee at
21 Lincoln those three people?
22    A.  The temporary release committee
23 at Lincoln is made up of positions, not
24 particular people.  As long as you have
25 someone from each position in the room, or

Page 104

1  Ruben Wills
2  something like that, that makes up the
3  committee.
4     Q.  Okay.  But you said those three
5  people were the people that were at the
6  hearing, correct?
7     A.  Yes, ma'am.
8     Q.  And did you appear at your
9  temporary release committee hearing scheduled
10 during that time?
11    A.  Yes, ma'am.
12    Q.  And what, if anything, happened
13 during the hearing?
14    A.  They asked me questions.  I
15 answered.
16       And I kept bringing up the issues
17 that I had during both hearings and the
18 process and the pieces of the process that
19 were wrong.
20    Q.  So you testified during this
21 hearing; is that correct?
22    A.  Yes, ma'am.
23    Q.  And was the testimony that you
24 provided during this hearing, was it truthful
25 and accurate?

Page 105

1  Ruben Wills
2     A.  Yes.
3     Q.  Was a decision made by the
4  committee as a result of the hearing?
5     A.  Yes, to remove me from temporary
6  work release.
7     Q.  Were you told the reason as to
8  why you were going to be removed from your
9  temporary work release?
10    A.  No.  They just told me I was no
11 longer suitable, which I didn't understand.
12    Q.  And did the superintendent at
13 Lincoln Correctional Facility approve the
14 committee's decision --
15    A.  Yes.
16    Q.  -- to remove you from the
17 temporary work release program?
18    A.  Yes.
19    Q.  So based on what you just
20 testified, Lieutenant Woodbury was not
21 present during your temporary work release
22 committee hearing that was hold sometime
23 after April 8, 2019, correct?
24    A.  I do not believe she was present.
25    Q.  She was not part of the temporary

27 (Pages 102 - 105)

Page 106

```
 1              Ruben Wills
 2   work committee who recommended to revoke your
 3   temporary work release in 2019, is that
 4   correct, based on what you just said?
 5       A.   Yes.  That is the same committee.
 6       Q.   Yes, she was not part of it?  She
 7   was not part of the decision making that day;
 8   is that correct?
 9       A.   I do not remember her being in
10   the room.
11            And if she was part of it after
12   the fact, I would have no knowledge.
13       Q.   But she was not at the hearing,
14   correct?
15       A.   I do not remember her being at
16   the hearing.  That doesn't mean she wasn't
17   there, that just means my memory might be
18   faulty.
19       Q.   You listed three other
20   individuals, is that correct, who were
21   present at the hearing?
22       A.   Yes.  I remember those three
23   individuals for specific reasons.
24       Q.   And Ms. Woodbury was not one of
25   those three people; is that correct?
```

Page 107

```
 1              Ruben Wills
 2       A.   Not one of those three, no.
 3       Q.   So, to your knowledge, you don't
 4   know that Lieutenant Woodbury had any
 5   personal involvement in the decision to
 6   revoke your temporary work release?  Yes or
 7   no?
 8       A.   No.
 9       Q.   Mr. Wills, April 2019 was not the
10   first time that you were found guilty of
11   unauthorized medication charge; is that
12   correct?
13       A.   Yes, that is correct.
14       Q.   Because that also happened in
15   2018; is that correct?
16       A.   Yes, it did.
17       Q.   And this was during the time that
18   you were on industrial training at Hudson
19   Correctional Facility; is that correct?
20       A.   Yes, ma'am.
21       Q.   So directing your attention to
22   June 14th of 2019, you were incarcerated at
23   that time, is that right?
24       A.   Yes.
25       Q.   Was that at Hudson Correctional
```

Page 108

```
 1              Ruben Wills
 2   Facility?
 3       A.   Yes.
 4       Q.   On June 4, 2019, were you handed
 5   a misbehavior report dated June 1st of 2019?
 6       A.   I was handed one.  I don't
 7   remember the exact date.
 8       Q.   And do you remember who handed
 9   you that misbehavior report?
10       A.   No.
11       Q.   Where were you specifically in
12   the facility when you were handed that
13   misbehavior report?
14       A.   I do not remember.
15       Q.   What were the charges in that
16   specific misbehavior report in June of 2019?
17       A.   I believe unauthorized medication
18   and smuggling.
19       Q.   And would that be the same two
20   charges that you were charged with in the
21   April 2019 misbehavior report?
22       A.   Yes.
23       Q.   Did the misbehavior report
24   indicate the facts for which you were being
25   charged?
```

Page 109

```
 1              Ruben Wills
 2       A.   Yes, I am sure it did.
 3       Q.   What, if anything, did the
 4   miss -- do you remember what the misbehavior
 5   report from June 2018 stated?
 6       A.   No, I don't remember.  I remember
 7   the charges, and I remember the disposition
 8   of them.
 9       Q.   What was the medication that you
10   were being charged for unauthorized
11   medication?
12       A.   It was two different medications.
13       Q.   Which were -- what were those
14   medications?
15       A.   One was Benadryl, and one was a
16   medication that DOCCS actually prescribed to
17   me, but it was out of date.
18       Q.   One moment.
19       A.   It was something that DOCCS
20   prescribed for me.  It came to me from Marcy
21   to that facility.  And they gave it to me
22   because they said the prescription was up.
23       Q.   I will be showing you what will
24   be marked as Defendant's Exhibit B.
25       A.   Uh-huh.
```

## Page 110

Ruben Wills

Q. It is Bates stamped State Defendant 000049, and I will be sharing it with you.
   Mr. Wills, I am going to scroll down, so -- and just let me know when you need me to scroll down further.
   I will give you an opportunity to review the document, and you give me instruction as to when you want me to scroll further down.
   (Whereupon, a document was marked as Defendant's Exhibit B for identification, as of this date.)
A. Oh, NyQuil. Okay. You can scroll down. NyQuil.
Q. Is this document the misbehavior report that you were issued in June of 2018?
A. Yes.
   So can I correct my answer?
   I said Benadryl; it was NyQuil.
Q. And can you please tell me where the NyQuil pills were found?
A. It says it was found during a locker search, inside of my locker.

## Page 111

Ruben Wills

Q. Okay. And so the NyQuil pills were also found in your locker; is that correct?
A. Yes.
Q. And how many pills of NyQuil were found in your locker?
A. I do not remember that, but it couldn't be more than maybe two to four pills.
   MS. DEDUSHI: And I am going to stop sharing.
A. I believe.
Q. And how were these pills stored in your locker?
A. They were inside the medication bottle.
Q. And when you say inside the medication bottle, was the bottle -- the medication bottle for NyQuil, or for other pills?
A. No, for other pills.
Q. And is there reason why the NyQuil pills were not in the original package in which they were found?

## Page 112

Ruben Wills

A. Yeah. Sure.
   That is how I was able to -- that is how I had to carry them when the nurse gave them to me in Ulster.
Q. Did you have a prescription from the facility regarding these NyQuil pills?
A. No, I did not.
Q. Where did you get these NyQuil pills that you stored in the facility?
A. The nurse at the facility.
Q. Did you remember which nurse gave them to you?
A. No, I do not.
   I do remember it was one of the trips that I had taken down, that I spoke to earlier. And there was some circumstances where the nurse gave me the NyQuil pills, because I had a fever of like a hundred and something, my ear was swollen out huge, and I was suffering from -- what is it, the condition when your muscles start to turn to jelly from being in the wheelchair? I forget the name of it.
   The nurse had some compassion and

## Page 113

Ruben Wills

gave me some NyQuil pills in order to do it.
   I kept them.
Q. So she gave you -- that nurse --
A. It was a male. It was not a female, it was a male.
Q. So he gave you the NyQuil pills without a prescription, that is what you are saying?
A. Yes, 'cause he gave them to me.
Q. Okay.
A. He literally handed them to me right then and there. It wasn't like they -- he gave them to me, told me to take these. He gave me couple of extra ones in the envelope.
   And as soon is I got back, I put them in my bottle and just kept them, which came with me through from Marcy to Hudson, which is why they dropped the smuggling charge, because they knew that it had to have come in at that time.
Q. Did you inform the facility, Hudson, when you were transferred, that you were in possession of these NyQuil pills?

Page 114

1  Ruben Wills
2  A.  No, I forgot.  And I told them I
3  would plead guilty, because I just forgot, to
4  that charge.
5  Q.  Did you inform medical that you
6  were in possession of these NyQuil pills at
7  Hudson Correctional Facility?
8  A.  No, because I forgot.
9  Q.  Did you have a disciplinary
10 hearing related to the June 1, 2018
11 misbehavior report?
12 A.  Yes, ma'am.
13 Q.  And was that disciplinary hearing
14 held on June 14th of 2018?
15 A.  I don't remember the exact date
16 again, but it was held.  I remember where it
17 was held.
18 Q.  Do you remember who the hearing
19 officer was who the hearing officer was that
20 presided disciplinary hearing was?
21 A.  I believe was an acting captain.
22 Q.  Do you plead guilty or not
23 guilty?
24 A.  I pled not guilty to the
25 smuggling charge, and I told them I would

Page 115

1  Ruben Wills
2  plead guilty to actually having it, because I
3  did have it.
4  Q.  And did you ask for any specific
5  witness during your disciplinary hearing?
6  A.  Not that I can remember.
7      I did bring up the fact that the
8  medical -- all of the medication bottles went
9  through the proper search when I got there.
10 And because I was transferred there, I
11 believe by myself that day, it was like a
12 three-hour exhaustive search.
13     If I would have brought in any
14 other kind of way, it would have been through
15 some type of means of incredible magic; so he
16 dropped the smuggling.
17 Q.  During this disciplinary hearing,
18 did the hearing officer contact the prior
19 facility where you said you received these
20 pills?
21 A.  No.  He went to medical at the
22 facility, and he contacted medical at the
23 facility.
24     And all medical did was look up
25 the prior prescriptions and noted that I

Page 116

1  Ruben Wills
2  didn't have a prescription for it.
3      They did have the exact instance
4  noted that I had the fever, that I had the
5  ear infection, that I forget the muscle
6  condition.
7      But they did not bother to call,
8  from what I was told, over to the facility to
9  ask anybody anything.
10 Q.  Are you sure about that, that
11 they didn't ask the nurse to call the
12 facility?
13 A.  I said from what I was told.
14 They told me that they didn't need to do
15 that.
16     They checked the actual record of
17 me being there, and they said yes, I was
18 there, yes, these things happened, but they
19 didn't have a prescription.
20     And I told them I didn't remember
21 the nurse's name, but it was a male young
22 nurse.  So if they did that, they would be
23 able to find it.
24     What I was told that they didn't
25 need to do it.  If they did it, they were

Page 117

1  Ruben Wills
2  just, you know, blowing me off.  I don't
3  know.  They could have been brushing me off.
4      Because at that point, they
5  didn't -- I didn't have any authority for
6  them to do anything like that.
7  Q.  But based on what you said, you
8  just testified that the hearing officer did
9  check with the facility's medical at Hudson
10 to see whether you had a prescription for
11 NyQuil.  Is that correct, yes or no?
12 A.  Yes, absolutely.
13 Q.  He found out that you did not
14 have a prescription at Hudson Correctional
15 Facility?
16 A.  Yes, ma'am.
17 Q.  Did you testify at your June 2018
18 disciplinary hearing?
19 A.  Yes.
20 Q.  Was the testimony you gave at
21 your disciplinary hearing in June of 2018
22 true and accurate?
23 A.  Yes.
24 Q.  Did the hearing officer issue a
25 decision regarding the June 2018 disciplinary

30 (Pages 114 - 117)

Page 118

1       Ruben Wills
2  hearing?
3     A.    Yes.
4     Q.    And what was the disposition?
5     A.    He dropped the smuggling, and he
6  held me guilty for the actual possession of
7  the NyQuil.
8     Q.    Did the hearing officer tell you
9  why they found you guilty?
10    A.    Because I had it. I admitted I
11 had it.
12    Q.    Did they inform you of the
13 evidence that they relied upon in making that
14 decision?
15    A.    I don't remember.
16          But I am sure it would be the
17 nurse's contact, or the nurses looking at the
18 record, and me saying yes, I had the NyQuil.
19 I didn't lie about it.
20    Q.    Were there sanctions imposed as a
21 result of the officer's disposition for the
22 June 2018 hearing?
23    A.    I don't recall what they were. I
24 am sure they were. There was loss of
25 something, if I can remember correctly.

Page 119

1       Ruben Wills
2     Q.    After the sanctions were imposed,
3  did that change the housing -- did that
4  change your status within the facility at
5  all?
6     A.    No, that didn't change.
7           Actually, I think it was I had
8  clean-up. I was on clean-up detail for like
9  seven days straight, or something like that.
10          I might have lost packages or
11 phones for like 30 days. I don't remember.
12 But that sounds in the realm of what I
13 remember.
14    Q.    Okay. And did you appeal your
15 June 14, 2018 disciplinary hearing
16 disposition?
17    A.    I don't believe I appealed that.
18    Q.    Okay.
19    A.    I am not sure, though. I don't
20 believe I did.
21    Q.    Mr. Wills, as we just discussed
22 during this, so far you conceded that you
23 were disciplined for unauthorized medication
24 both in June of 2018 and April of 2019,
25 correct? Yes or no?

Page 120

1       Ruben Wills
2     A.    Yes.
3           THE WITNESS: Can you hold on one
4  second please?
5           MS. DEDUSHI: Yes.
6           MR. RICKNER: We have been going
7  an awful long time. I don't know if
8  Mr. Wills is still within earshot.
9           Can we take ten?
10          MR. DEDUSHI: We can totally do
11 that.
12          I guess my question is --
13          THE WITNESS: I am sorry. I was
14 dealing with the landscaper.
15          MR. RICKNER: He can answer the
16 pending question, if you want.
17          MR. DEDUSHI: You know, I will
18 withdraw that question, because that is
19 another section I am going to enter
20 into.
21          I guess my question to you guys
22 is, do we want to take a lunch break at
23 any point? And this may be the
24 appropriate time to do so. I don't
25 know.

Page 121

1       Ruben Wills
2           MR. RICKNER: Well, I mean, it
3  depends on how much more time do you
4  think? We have been going for two hours
5  and change. I assume you have an idea
6  how far along you are in the outline.
7           MS. DEDUSHI: Yes. I think I
8  have like another hour, hour and a half
9  max, probably. I don't think I have
10 more than that.
11          MS. MEKLES: And I will need like
12 an hour, hour and a half.
13          MS. DEDUSHI: Would it make more
14 sense if we just took a lunch break and
15 then just continue?
16          MR. RICKNER: I would push
17 through for another half hour, and then
18 take a lunch break. It is a bit
19 earlier.
20          MS. DEDUSHI: Okay. So did you
21 still want to take --
22          MR. RICKNER: Let's take ten
23 minutes for the bathroom.
24          MR. DEDUSHI: We can take a
25 bathroom break for ten minutes, and then