UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

------------------------------------------------------- X

RUBEN WILLS,                              :
                                          :
                         Plaintiff,       :     **MEMORANDUM DECISION**
                                          :     **AND ORDER**
           - against -                    :
                                          :     20-cv-4432 (BMC)
MICROGENICS CORPORATION;                  :
SHEILA WOODBERRY; and CAPTAIN             :
DOE,                                      :
                                          :
                         Defendants.      :

------------------------------------------------------- X

**COGAN**, District Judge.

Plaintiff Ruben Wills, a former New York City Council member, brings claims for negligence and violation of his Fourteenth Amendment right to procedural due process against Microgenics Corporation and Sheila Woodberry, respectively.[1]

Plaintiff was convicted on corruption charges, although his conviction was later reversed on direct appeal. See People v. Wills, 186 A.D.3d 1416, 130 N.Y.S.3d 93 (2nd Dep't 2020). While still incarcerated, and shortly before his scheduled parole, officials from the New York State Department of Corrections and Community Supervision ("DOCCS") selected him for random drug testing. The officials used a urinalysis test and testing protocol that was designed, manufactured, and sold by Microgenics. The test returned what plaintiff claims was a false positive. State officials revoked plaintiff's eligibility for parole, and plaintiff remained incarcerated for several additional months. He is now out of prison.

---

[1] As a result of prior rulings in the case and plaintiff's withdrawal of claims against certain defendants, only plaintiff's claims for negligence against Microgenics and for violation of his procedural due process rights against Woodberry remain.

This case is before the Court on Microgenics' motion to exclude plaintiff's expert, its motion for summary judgment, and Woodberry's motion for summary judgment. For the reasons that follow, Microgenics' motions are denied; Woodberry's motion is granted.

## BACKGROUND

Microgenics manufactures and sells a drug screening test which consists of an FDA-approved assay. The test mixes a chemical reagent with urine; and an FDA-approved urinalysis analyzer, a medical device that analyzes the mixture. The assay at issue here, the CEDIA Buprenorphine II Assay (the "Assay"), is used to detect buprenorphine, an opioid that is used to treat opioid use disorder and pain. Microgenics contracted with the New York State Department of Corrections and Community Supervision ("DOCCS") to provide drug screening tests which included the Assay, training on how to use those tests, and testimony at disciplinary hearings at all of DOCCS' correctional facilities.

The Assay is 98% accurate, but it can produce a false positive result if it reacts with substances in urine other than buprenorphine. This is referred to as "cross-reactivity." The FDA-approved package insert for the Assay identifies more than 65 potentially cross-reactive compounds and acknowledges that "[i]t is possible that substances other than those investigated in the specificity study may interfere with the test and cause false results." The insert also states, under a section entitled "Intended Use," that "[t]he assay provides only a preliminary analytical test result. A more specific alternative chemical method must be used to obtain a confirmed analytical result. Gas chromatography/mass spectrometry (GC/MS) or Liquid chromatography/ tandem mass spectrometry (LC-MS/MS) is the preferred confirmatory method." Additionally, "[c]linical and professional judgment should be applied to any drugs of abuse test result, particularly when preliminary results are used." In a separate section of the insert, entitled "Limitations," it states that "[t]his is a screening test. All positive results must be confirmed via

2

GC/MS or LC-MS/MS." The Limitations section also explains that "[i]t is possible that substances other than those investigated in the specificity study may interfere with the test and cause false results."

Despite these statements, approved for the Assay by the FDA, there is no evidence that Microgenics ever instructed DOCCS during its training on how to use the Assay that a confirmatory test, such as GC/MS or LC-MS/MS, was necessary. Rather, Microgenics approved DOCCS' policy for handling positive drug test results obtained using the Assay, which was to run a second test using the same Assay.

While plaintiff was incarcerated at Lincoln Correctional Facility and participating in a work release program that allowed him to remain in the community six days per week, plaintiff was randomly selected for drug testing. A DOCCS officer used a drug screening test provided by Microgenics, which included the Assay, to drug test plaintiff. The test came back positive for buprenorphine. The DOCCS officer then conducted a second test, also using the Assay, and that test came back positive as well. A Microgenics employee monitored and supervised this drug testing.

Based on these positive drug test results, plaintiff was charged with drug use. DOCCS held a disciplinary hearing on this charge and found plaintiff guilty. The DOCCS official who presided over the hearing sentenced plaintiff to thirty days in "keeplock," which restricts incarcerated individuals' ability to leave their cell. This sentence was suspended as long as plaintiff did not commit any further infractions over the next sixty days, and plaintiff was never ultimately placed in keeplock. The DOCCS official also recommended that the Temporary Release Committee (the "TRC") review plaintiff's participation in the work release program based on the drug use infraction. The TRC is responsible for making recommendations as to an

individual's participation in work release, which is then either approved or disapproved by the superintendent of the facility at which the individual is being held.

A few days after this disciplinary hearing, DOCCS officials found Benadryl in plaintiff's locker, for which plaintiff did not have a prescription. Plaintiff was charged with unauthorized possession of medicine and smuggling prohibited items into a DOCCS facility. Woodberry, a DOCCS official, presided over plaintiff's disciplinary hearing concerning his possession of Benadryl. She found him guilty of unauthorized possession of medicine, but not of smuggling. Woodberry imposed a penalty of 15 days' loss of recreation. However, she did not recommend that the TRC review plaintiff's participation in the work release program based on the infraction.

Plaintiff appeared before the TRC the day after his hearing before Woodberry for it to reconsider his participation in the work release program. The TRC recommended plaintiff's removal from the work release program because he denied drug use despite the positive test results and because of his unauthorized Benadryl possession. The superintendent of Lincoln Correctional Facility, Delta Barometre, approved the TRC's recommendation and plaintiff was removed from work release.

Two days later, the parole board denied plaintiff's request for presumptive parole, which would have allowed plaintiff to be released without appearing before the parole board, based on both plaintiff's positive drug test result and his possession of Benadryl.

## DISCUSSION

The Court may only consider admissible evidence in evaluating the parties' motions for summary judgment. See Raskin v. Wyatt Co., 125 F.3d 55, 66 (2d Cir. 1997). "Accordingly, when a party offers expert testimony in support or opposition to summary judgment and a separate motion has been made to preclude such testimony, a court must decide the motion to preclude first, in order to determine whether such testimony may be considered in connection

with the summary judgment motion." Forte v. Liquidnet Holdings, Inc., No. 14-cv-2185, 2015 WL 5820976, at *4 (S.D.N.Y. Sept. 30, 2015), aff'd, 675 F. App'x 21 (2d Cir. 2017) (citing Raskin, 125 F.3d at 66). I thus turn first to Microgenics' motion to exclude the testimony of plaintiff's expert, Dr. Robert Swotinsky.

## I.    Microgenics' Motion to Exclude Expert Opinion of Dr. Swotinsky

Federal Rule of Evidence 702 governs the admissibility of expert testimony. It requires a proponent to establish by a preponderance of the evidence that:

> (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (b) the testimony is based on sufficient facts or data; (c) the testimony is the product of reliable principles and methods; and (d) the expert's opinion reflects a reliable application of the principles and methods to the facts of the case.

Fed. R. Evid. 702. In other words, "the Court must determine: (1) whether the witness is a qualified expert; (2) whether the opinion is based on application of reliable data and methodology to the facts of the case; and (3) whether the expert's testimony will assist the trier of fact to understand the evidence or determine an issue of fact." Boateng v. Bayerische Motoren Werke Aktiengesellschaft, No. 17-cv-209, 2022 WL 4357555, at *10 (E.D.N.Y. Sept. 20, 2022) (citation omitted).

The Rule 702 standard is not onerous; "exclusion of expert testimony is warranted only when the district court finds serious flaws in reasoning or methodology." Lickteig v. Cerberus Cap. Mgmt., L.P., 589 F. Supp. 3d 302, 330 (S.D.N.Y. 2022) (cleaned up). "Vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence." Daubert v. Merrell Dow Pharms., Inc., 509 U.S. 579, 596 (1993).

Rule 702, however, still imposes limits on how shaky an expert's testimony can be. It excludes expert opinions that are "speculative or conjectural or based on assumptions that are so

unrealistic and contradictory as to suggest bad faith or to be in essence an apples and oranges comparison." Restivo v. Hessemann, 846 F.3d 547, 575-76 (2d Cir. 2017).

Here, Dr. Swotinsky's testimony would be relevant and helpful to the trier of fact in determining whether Microgenics breached a duty of care owed to plaintiff. He opines that "[t]he standard of practice for forensic urine drug testing includes complete chain of custody procedures and positive results supported by specific confirmatory tests," and that plaintiff's drug test "had neither." To show that Microgenics breached a duty of care owed to plaintiff, plaintiff will need to prove that Microgenics deviated from the relevant standard of care it owed to plaintiff, resulting in the false positive drug test result. Dr. Swotinsky's testimony explains what the relevant standard of care is, and his opinion that Microgenics deviated from it. This will be helpful to the trier of fact in determining whether Microgenics breached a duty of care owed to plaintiff, one of the elements plaintiff must prove to prevail on his negligence claim. Thus, Dr. Swotinsky's testimony "will help the trier of fact to understand the evidence or to determine a fact in issue." Fed. R. Civ. P. 702(a).

Microgenics' argument, that Dr. Swotinsky's opinions are not relevant or helpful because he does not consider whether plaintiff's drug test was accurate, construes the questions for the trier of fact in this case too narrowly. It is true that plaintiff will need to prove that his drug test was a false positive to show that Microgenics breached a duty of care owed to plaintiff. But he will also need to show that Microgenics deviated from the relevant standard of care, which Dr. Swotinsky addresses.

Moreover, Dr. Swotinsky's opinion that "[t]he reliable identification of a drug following a preliminary positive result requires using a second analytical method for confirmation, one based on a different and, in most cases, more specific chemical principle," is not an inadmissible

legal conclusion.  Although "where the surgeon saws off the wrong leg, or there is injury to a part of the body not within the operative field, it is often held that the jury may infer negligence without the aid of any expert," "if the defendant can proffer any evidence to support the view that a proper standard of care was followed, the plaintiff cannot prevail *without* introducing expert medical testimony."  Sitts v. United States, 811 F.2d 736, 740 (2d Cir. 1987) (quotation and citation omitted) (emphasis added).  Here, Microgenics asserts that the relevant standard of care was that "an assay-based drug test [be] at least 98 percent accurate," and that it complied with this standard of care because its Assay was 98% accurate.  Dr. Swotinsky's testimony, that conducting drug screening tests that are 98% accurate without any confirmatory testing does not satisfy the standard of care, is thus necessary to rebut Microgenics' assertion that it followed the proper standard of care.

Dr. Swotinsky is qualified to provide these opinions.  He is a board-certified physician in occupation medicine with thirty-eight years of experience.  This includes five years working with buprenorphine-assisted treatment of opioid-dependent patients, which involved urine testing for buprenorphine.  Dr. Swotinsky has thirty-five years of experience as a medical review officer reviewing workplace drug test results.  He is also the co-author of a physician certification examination for workplace drug testing, and he consults with government agencies on workplace drug testing.  He has written two textbooks on the subject.

The fact that Dr. Swotinsky's experience with drug testing is in the occupational setting does not mean that he lacks the qualifications to provide opinions about the forensic setting.  See Tools Aviation, LLC v. Digital Pavilion Elecs. LLC, No. 20-cv-2651, 2024 WL 4350466, at *7 (E.D.N.Y. Sept. 30, 2024) ("A witness may have sufficient experience to qualify him as an expert even if his experience is in a slightly different area than the one he will testify about")

(collecting cases); Stella v. Davis Cty., No. 18-cv-2, 2022 WL 2715843, at *1 (D. Utah July 13, 2022) ("[A] medical professional need not necessarily have experience in a correctional setting to qualify as an expert on whether adequate medical care was provided."); Tolliver v. Wexford Health Sources, Inc., No. 16-cv-130, 2021 WL 4478674, at *2 (S.D. Ill. Sept. 30, 2021) ("Experience providing medical care in a correctional setting is not required to satisfy Daubert."); Patient A v. Vermont Agency of Hum. Servs., No. 14-cv-206, 2015 WL 6449301, at *5 (D. Vt. Oct. 23, 2015) ("[T]he mere fact of incarceration does not justify the delivery of health care lower in quality than an inmate would receive outside of prison. . . .  Often, a medical provider who practices within a jail or prison setting is held to the same standard of care as a provider who practices within the general medical community." (citations omitted)); Anderson v. Columbia Cnty., Ga., No. 12-cv-31, 2014 WL 8103792, at *9-10 (S.D. Ga. March 31, 2014) (an internist with over sixteen years of experience was qualified "as an expert to discuss matters relating to the standard of care relevant . . . to nurses in correctional facilities" even though he had never worked in a forensic setting because "the Court remains unpersuaded that correctional medicine is a *medical* specialty thereby requiring the exclusion of [the internist].").

Similarly, Dr. Swotinsky's methodology is not unreliable just because he applies workplace drug testing standards to forensic drug testing standards, as Microgenics argues.  In New York, the standards of care applicable to proprietary functions of a prison, such as the provision of medical care, are the same as in the private setting.  See Schrempf v. State, 66 N.Y.2d 289, 294, 496 N.Y.S.2d 973 (1985).  Thus, the standards of care owed in a forensic setting are not so different from other settings as to render Dr. Swotinsky unqualified or to make his methodology irrelevant, unhelpful, or unreliable.

Microgenics' assertion that Dr. Swotinsky ignored reliable data showing that the Assay was 98% accurate misses the import of Dr. Swotinsky's opinion.  Dr. Swotinsky does not dispute that the Assay is 98% accurate.  Rather, he opines that conducting drug testing with a 98% accurate Assay, without confirmatory testing, falls short of the relevant professional standards for drug testing.  Dr. Swotinsky supports this opinion with literature on workplace drug testing, Microgenics' own product insert accompanying the Assay, and Dr. Swotinsky's own experience with drug testing.  These sources are sufficiently reliable to form the basis of Dr. Swotinsky's opinion.

Microgenics argues that, if Dr. Swotinsky is offering a separate opinion that Microgenics misrepresented the reliability of the Assay, he lacks qualifications to offer that opinion.  Additionally, such an opinion is not helpful because it simply summarizes the testimony of fact witnesses.  Plaintiff has clarified that Dr. Swotinsky will not testify that Microgenics deceived DOCCS, but argues that he should "be allowed to comment on" evidence that Microgenics deceived DOCCS, "once it is in evidence."  The Court accepts plaintiff's representation that Dr. Swotinsky will not testify that Microgenics deceived DOCCS.  It is unclear what Dr. Swotinsky would have to say about other evidence on the same subject.  If plaintiff wishes to introduce Dr. Swotinsky's testimony about Microgenics' and DOCCS' adherence to relevant professional standards and what those standards are, such testimony will be allowed.  Other testimony, outside the scope of that disclosed in Dr. Swotinsky's expert report, will not be allowed.

Because Dr. Swotinsky is qualified to provide the opinions he does in this case, his opinions will be relevant and helpful to the trier of fact, and that he has employed no "serious flaws in reasoning or methodology," Lickteig, 589 F. Supp. 3d at 330, I decline to exclude Dr. Swotinsky's testimony.

## II.     Microgenics' Motion for Summary Judgment

Rule 56 of the Federal Rules of Civil Procedure provides that summary judgment is warranted where the "movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The court must view all facts in the light most favorable to the nonmoving party. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986) (citing Adickes v. S. H. Kress & Co., 398 U.S. 144, 158-59 (1970)). There is no genuine issue of material fact "where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party." Lovejoy-Wilson v. NOCO Motor Fuel, Inc., 263 F.3d 208, 212 (2d Cir. 2001) (quoting Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986) (cleaned up)).

Microgenics has moved for summary judgment on plaintiff's negligence claim, his only claim against Microgenics. "The elements of a negligence claim under New York law are: '(i) a duty owed to the plaintiff by the defendant; (ii) breach of that duty; and (iii) injury substantially caused by that breach.'" Pasternack v. Lab'y Corp. of Am. Holdings, 807 F.3d 14, 19 (2d Cir. 2015) (quoting Lombard v. Booz–Allen & Hamilton, Inc., 280 F.3d 209, 215 (2d Cir. 2002)). Microgenics asserts that it is entitled to summary judgment because the undisputed facts show that it did not breach a duty owed to plaintiff and that, even if there was such a breach, it did not cause any injury to plaintiff. Microgenics also argues that, because there is no evidence that it caused plaintiff physical injury, plaintiff may not recover damages.

### A.  Breach of Duty Owed to Plaintiff

In considering whether Microgenics breached a duty owed to plaintiff, I first confirm that Microgenics did, in fact, owe a duty to plaintiff. "[A] party who enters into a contract to render services may be said to have assumed a duty of care . . . to third persons . . . where the contracting party, in failing to exercise reasonable care in the performance of his duties, launches

10

a force or instrument of harm." Espinal v. Melville Snow Contractors, Inc., 98 N.Y.2d 136, 140, 746 N.Y.S.2d 120 (2002) (cleaned up). False positive drug results are forces or instruments of harm: they "have profound, potentially life-altering, consequences for a test subject." Landon v. Kroll Lab'y Specialists, Inc., 22 N.Y.3d 1, 6, 977 N.Y.S.2d 676 (2013). And Microgenics had the power to launch such harm by failing to exercise reasonable care. Microgenics was in charge of training DOCCS staff on how to use the Assay, and indeed did teach DOCCS how to use it. Moreover, a Microgenics employee monitored and supervised the DOCCS corrections officer who ran plaintiff's drug test. Because Microgenics was "in the best position to prevent false positive results," id., given its position teaching DOCCS how to use the Assay and overseeing plaintiff's drug test, its failure to exercise reasonable care would launch a force of harm, creating a duty to drug test subjects to exercise reasonable care. Specifically, Microgenics had a duty to "adhere to professionally accepted testing standards." Id.[2]

Genuine disputes remain as to whether Microgenics breached this duty owed to plaintiff. Plaintiff has presented admissible evidence that the relevant professional standard in conducting drug tests is to use a confirmatory test to confirm a positive result from a test using an assay such as Microgenics' Assay. This includes Dr. Swotinsky's testimony to that effect and the FDA-approved insert stating as much. There is no evidence that Microgenics told DOCCS it needed to comply with this standard when using its Assay, either in training DOCCS generally or in

---

[2] It does not matter that Microgenics was not a laboratory or program administrator. The New York Court of Appeals held in Pasternack v. Lab'y Corp. of Am. Holdings, 27 N.Y.3d 817, 826-27, 37 N.Y.S.3d 750 (2016), that "the regulations and guidelines that are ministerial in nature and do not implicate the scientific integrity of the testing process do not create a duty of care for drug testing laboratories and program administrators under New York negligence law." This does not establish that only laboratories and program administrators must ensure that their testing processes stand up to scientific integrity; the court "merely held that a drug testing laboratory did not owe the test subject a duty to comply with 'ministerial federal regulations and guidelines unrelated to scientific integrity.'" Wills v. Microgenics Corp., No. 20-cv-4432, 2021 WL 1838275, at *1 (E.D.N.Y. May 7, 2021) (quoting Pasternack, 27 N.Y.3d at 826, 37 N.Y.S.3d 750)). Plaintiff's issue is with "the scientific integrity of the testing process, not the ministerial administration of that process," id., so this case is no bar to plaintiff's claim.

monitoring the running of plaintiff's drug test.  It is a disputed fact whether this constituted a breach of the relevant professional standard, and therefore a breach of the duty owed to plaintiff.

Microgenics asserts that it complied with any duty owed to plaintiff because the Assay was more than 98% accurate in detecting true positive results.  In Peranzo v. Coughlin, 850 F.2d 125 (2d Cir. 1988), the Second Circuit considered whether a test that is more than 98% accurate "is sufficiently reliable so that the use of the results as evidence, even as the only evidence, in a disciplinary hearing does not offend due process." Peranzo v. Coughlin, 675 F. Supp. 102, 105 (S.D.N.Y. 1987), aff'd, 850 F.2d 125.  The Second Circuit answered that question in the affirmative.  But that is not the question in this case.  As discussed above, the question here is whether Microgenics breached its duty to plaintiff "to perform his drug test in keeping with relevant professional standards." Landon, 22 N.Y.3d 1, 6-7, 977 N.Y.S.2d 676.  What is sufficient to comply with due process is not necessarily in compliance with "relevant professional standards," so the fact that Microgenics complied with the standard set out on Peranzo is irrelevant to plaintiff's claim.

Plaintiff also adequately establishes a question of fact as to whether his drug test result was a false positive.  He testified at his deposition that the only medications he was taking at the time of his drug test were medications prescribed through DOCCS (which did not include buprenorphine), and Benadryl.  This is sufficient to survive summary judgment on this point.  "A single witness's sworn testimony, if believed by a jury, can support a verdict, and is enough to raise a genuine issue of fact precluding summary judgment." Bradshaw v. City of New York, 855 F. App'x 6, 9 (2d Cir. 2021) (citations omitted).

One person's testimony is sufficient to raise a genuine issue of fact unless the testimony "is blatantly contradicted by the record, so that no reasonable jury could believe it." Id. at 10

(quotation omitted); see also Jeffreys v. City of New York, 426 F.3d 549, 555 (2d Cir. 2005) (plaintiff's testimony insufficient to raise genuine issue of fact because it was "contradictory and incomplete" and "no reasonable person would undertake the suspension of disbelief necessary to give credit to the allegations made" (cleaned up)). Here, Microgenics points to no evidence that plaintiff was taking buprenorphine or had any history of abusing opioids, which could render his testimony unbelievable. Cf. Spencer v. Lab'y Corp. of Am. Holdings, No. 19-cv-4927, 2024 WL 3675855, at *9 (E.D.N.Y. Aug. 6, 2024) (plaintiff's allegation that he did not use drugs was "implausible . . . given the sheer number of positive test results that have been reported for him, [his girlfriend], and even one of their children"). The fact that the Assay was more than 98% accurate also does not provide the necessary contradictory record: Microgenics admits that the Assay can produce false positive results. Because plaintiff's testimony is neither "contradictory" nor "incomplete," Jeffreys, 426 F.3d at 555, his testimony is sufficient to create a genuine issue of fact.

Nor is it true that plaintiff's negligence claim fails because he has not introduced expert testimony to prove that plaintiff's drug test result was a false positive. As Microgenics itself acknowledges, "expert testimony is required to establish causation *where the issue of causation is beyond the knowledge of lay jurors*." In re Mirena IUS Levonorgestrel-Related Prods. Liab. Litig. (No. II), 387 F. Supp. 3d 323, 341 (S.D.N.Y. 2019), aff'd, 982 F.3d 113 (2d Cir. 2020) (internal quotation marks and quotation omitted) (emphasis added). In other words, "expert testimony is *not* generally required in tort cases where a lay juror can infer causation from common knowledge and lay experience." Id. (internal quotation marks and quotation omitted) (emphasis added). This Court is confident that jurors will be able to understand that, if they

choose to credit plaintiff's testimony, his lack of opioid use means that the result of his drug test was a false positive. An expert is not needed to explain that.

The case Microgenics cites for the proposition that expert testimony is required, <u>Rosco v. Mirror Lite Co.</u>, 506 F. Supp. 2d 137 (E.D.N.Y. 2007), simply confirms that unqualified experts' interpretations of test results are inadmissible. Plaintiff does not proffer such expert testimony. Instead, the evidence plaintiff offers in support of a false positive result is his own, fact testimony. The implication that may be drawn from <u>Rosco</u> is not that an expert is the only one who can prove a false positive drug test result; it is that if a party intends to prove a false positive through an expert's interpretation of test results, the expert must be qualified. <u>Id.</u> at 147.

Microgenics' final argument as to why it did not breach a duty owed to plaintiff is that "no New York court has held a drug test supplier liable simply because a better test or procedure might be available." But nowhere does plaintiff argue that Microgenics breached its duty simply by not offering the best test or procedure available. Rather, plaintiff's challenge is to Microgenics' failure to comply with professional accepted scientific testing standards, about which there remain disputed issues of material fact. Thus, Microgenics is not entitled to summary judgment on this ground.

### B. Injury Substantially Caused by Breach of Duty

Genuine disputes of material fact also remain as to whether Microgenics' breach of its duty owed to plaintiff caused plaintiff's injuries. A breach of duty is a sufficiently proximate cause of a plaintiff's injuries to support a claim of negligence when "the breach was a substantial factor in causing the injury." <u>Gayle v. Nat'l R.R. Passenger Corp.</u>, 701 F. Supp. 2d 556, 563 (S.D.N.Y. 2010) (quoting <u>Sawyer v. Wight</u>, 196 F. Supp. 2d 220, 227 (E.D.N.Y. 2002)). "There can be more than one proximate cause of an injury." <u>Id.</u> (citation omitted).

"Where the acts of a third person intervene between the defendant's conduct and the plaintiff's injury, the causal connection is not automatically severed." Derdiarian v. Felix Contr. Corp., 51 N.Y.2d 308, 315, 434 N.Y.S.2d 166 (1980). If "the intervening act is a normal and foreseeable consequence of the situation created by the defendant's negligence," the defendant's breach of duty owed to the plaintiff may still be a substantial cause of the plaintiff's injuries. Id. (citations omitted). If, on the other hand, "the intervening act is extraordinary under the circumstances, not foreseeable in the normal course of events, or independent of or far removed from the defendant's conduct, it may well be a superseding act which breaks the causal nexus." Id. (citations omitted).

Here, Microgenics identifies two intervening acts that it says were sufficiently independent from its conduct to break the nexus between Microgenics' breach and plaintiff's injuries. First, Microgenics asserts that DOCCS, not Microgenics, decided whether and how plaintiff should be punished for his positive drug test result. This argument might be compelling if Microgenics did not contract with DOCCS to provide Assays and train its staff in using them, knowing that two positive drug tests using the Assay would result in "a misbehavior report [being] written, and that would trigger the process for a [disciplinary] hearing wherein the assay would be . . . part of the presentation" that the individual should be disciplined. Even more telling, Microgenics also contracted with DOCCS to provide testimony at these disciplinary hearings about the accuracy of the Assay. Thus, the "normal and foreseeable consequence" of a false positive drug test result caused by Microgenics' failure to comply with relevant professional standards would clearly be a disciplinary hearing at which the Assay would be used as evidence that the individual should be punished.

DOCCS' eventual decision to punish plaintiff was not so independent from Microgenics' breach of its duty to cut off causation either: if, construing all facts in favor of plaintiff as the nonmovant, Microgenics breached its duty owed to plaintiff by failing to comply with the relevant professional standards, resulting in plaintiff's false positive drug test result, then DOCCS was certainly "misled" by Microgenics "by either withholding or misrepresenting evidence in order to sustain the case against [plaintiff]." Dufort v. City of New York, 874 F.3d 338, 352-53 (2d Cir. 2017). Microgenics' breach, according to plaintiff, was its failure to require, or even inform DOCCS that it was necessary to run, a confirmatory test to confirm a positive drug test result from the Assay. It follows that DOCCS would have had no knowledge that the positive drug test result from the Assay did not comply with relevant professional standards because of Microgenics' breach. This question of whether Microgenics misled DOCCS, resulting in plaintiff's punishment, is sufficient to create a question of fact precluding summary judgment. Cf. id. (Because there was a "question of material fact as to whether prosecutors and the grand jury were aware of the limited nature of [an eyewitness'] identification and the highly suggestive manner in which it was procured, such that their determinations [would] break the chain of causation," there were "questions of fact precluding summary judgment."). Accordingly, DOCCS' subsequent punishment of plaintiff for his positive drug test result was not, as a matter of law, an intervening act that would "break[ ] the causal nexus" between Microgenics' actions and plaintiff's injuries. Derdiarian, 51 N.Y.2d at 315, 434 N.Y.S.2d 166.

The second intervening act that Microgenics asserts breaks the chain between its actions and plaintiff's injuries is plaintiff's unauthorized possession of Benadryl, which DOCCS discovered a few days after plaintiff's positive drug test result. DOCCS removed plaintiff from

his work release program and denied his request for presumptive parole, which would have allowed plaintiff to be released without appearing before the parole board, based on both plaintiff's positive drug test result and his possession of Benadryl.[3]  DOCCS' reliance on both infractions does not make the possession of Benadryl an intervening act; clearly, *both* were, to some extent, the cause of plaintiff's injuries.  See Gayle 701 F. Supp. 2d at 563 ("There can be more than one proximate cause of an injury." (citation omitted)).

Neither of the above intervening acts present a situation "where only one conclusion may be drawn from the established facts and where the question of legal cause may be decided as a matter of law."  Derdiarian, 51 N.Y.2d at 315, 434 N.Y.S.2d 166.  Thus, "it is for the finder of fact to determine legal cause," id., precluding summary judgment.

## C.  Availability of Damages

Microgenics' final attempt to defeat plaintiff's negligence claim is its argument that plaintiff is not entitled to any damages because he did not suffer any physical injury.  See Taggart v. Costabile, 131 A.D.3d 243, 255-56, 14 N.Y.S.3d 388 (2nd Dep't 2015) (emotional injury is not compensable in the absence of physical injury if the emotional injury is a consequential, rather than direct, result of the breach of duty).

The undisputed facts show that plaintiff remained incarcerated for three days longer than if he had received presumptive parole.  If plaintiff prevails on his negligence claim at trial, the finder of fact will have found that Microgenics' breach of duty substantially caused the denial of plaintiff's request for presumptive parole.  The loss of these days of freedom is a sufficient physical injury to entitle plaintiff to damages.  As the Court of Appeals held in Landon, 22

---

[3] Microgenics asserts that plaintiff's delay in receiving parole is not a sufficient injury because he "was released from parole only three days later than he would have been if he received 'presumptive release.'"  But "[i]ncarceration, of any duration, represents a significant deprivation of liberty."  Codrington v. City of New York, No. 12-cv-1650, 2015 WL 893567, at *7 (E.D.N.Y. Mar. 2, 2015) (internal quotation marks and quotation omitted).

N.Y.3d 1, 8, 977 N.Y.S.2d 676, "the loss of freedom occasioned by the extension of . . . probation and the resulting emotional and psychological harm are sufficient" to allege a cognizable harm for which damages are recoverable.  The loss of freedom from remaining incarcerated, then, is an even clearer cognizable injury.[4]

Because genuine disputes of material fact prevent this Court from finding as a matter of law that Microgenics was not negligent, Microgenics' motion for summary judgment is denied.

## III.    Woodberry's Motion for Summary Judgment

Woodberry moves for summary judgment on plaintiff's claim that she is liable under 42 U.S.C. § 1983 for violating his Fourteenth Amendment right to procedural due process by effecting his removal from a temporary work release program.

"Federal courts 'examine procedural due process questions in two steps: the first asks whether there exists a liberty or property interest which has been interfered with by the State; the second examines whether the procedures attendant upon that deprivation were constitutionally sufficient.'" Francis v. Fiacco, 942 F.3d 126, 141 (2d Cir. 2019) (quoting Ky. Dep't of Corr. v. Thompson, 490 U.S. 454, 460 (1989)).  To prevail on a claim under § 1983, "the plaintiff must directly plead and prove that 'each Government-official defendant, through the official's own individual actions, has violated the Constitution.'" Tangreti v. Bachmann, 983 F.3d 609, 612 (2d Cir. 2020) (quoting Ashcroft v. Iqbal, 556 U.S. 662, 676 (2009)).  Additionally, claims under § 1983 "should be read against the background of tort liability that makes a man responsible for

---

[4] The fact that Landon was decided on a motion to dismiss does not change this analysis.  If an allegation of the extension of probation is sufficient to survive a motion to dismiss, then providing evidence of such extension, sufficient to at least raise a question of fact as to whether the probation was extended, is sufficient to survive summary judgment.  Cf. Bussey v. Phillips, 419 F. Supp. 2d 569, 582 (S.D.N.Y. 2006) (allegations that are "enough to survive a motion to dismiss" "must be supported by specific facts raising a genuine issue for trial" at the summary judgment stage).  Here, the parties do not dispute that plaintiff remained incarcerated for three additional days because DOCCS denied plaintiff's request for presumptive parole, based at least in part on his positive drug test result.  Thus, plaintiff has both adequately alleged and supported with evidence an injury that entitles him to damages.

the natural consequences of his actions," so plaintiff must also establish at least a question as to causation to survive summary judgment.  Malley v. Briggs, 475 U.S. 335, 344 n.7 (1986) (quoting Monroe v. Pape, 365 U.S. 167, 187 (1961)).

Woodberry does not dispute that there is a protected liberty interest in continuing in a work release program.  Rather, Woodberry asserts that plaintiff's due process claim fails because she was not personally involved in plaintiff's removal from work release, her disciplinary determination was not the proximate cause of the removal, and plaintiff was not deprived of due process in his removal from the work release program.

Here, plaintiff has not raised a genuine dispute about whether Woodberry was personally involved in interfering with his liberty interest in remaining in his work release program.  It was the TRC that recommended plaintiff's removal from the program, and the superintendent of Lincoln Correctional Facility, Delta Barometre, who approved the recommendation.

Woodberry's involvement was limited to presiding over a completely separate disciplinary hearing, which did not result in plaintiff's removal from work release, nor could it have – Woodberry was not authorized to remove plaintiff from the program.  Woodberry presided over plaintiff's disciplinary hearing for his possession of Benadryl, and found him guilty of unauthorized possession of medication.  She imposed a penalty of 15 days' loss of recreation.  After this hearing, Woodberry had no further interaction with plaintiff.  She did not refer plaintiff's unauthorized possession of medication discipline to the TRC.  She did not attend or testify at plaintiff's TRC hearing.  No one consulted Woodberry in the decision to remove plaintiff from the work release program.

In recommending to remove plaintiff from the work release program, the TRC relied, in part, on Woodberry's finding that plaintiff was guilty of unauthorized possession of medication.

But this is not enough to constitute personal involvement.  Where a government official does "nothing more" than alert other government officials of the need to take action against an individual, that official "cannot be held to have 'committed' or have been 'personally involved' in the alleged deprivation."  Dubois v. Beaury, No. 21-cv-2096, 2022 WL 1701497, at *4 (2d Cir. May 27, 2022) (district attorney who wrote letter to court with pistol licensing authority to report that plaintiff "appeared to be despondent" and "upon information and belief, was in possession of at least one automatic firearm" not sufficiently personally involved in plaintiff's deprivation of his pistol license when judge suspended plaintiff's license upon receipt of the letter (cleaned up)).  Here, Woodberry's involvement was even more attenuated, because she did not even alert the TRC of her finding at the disciplinary hearing.  The TRC's reliance on Woodberry's previous finding, on its own volition, thus did not personally involve Woodberry in the TRC's recommendation to remove plaintiff from the work release program.

Moreover, Woodberry's lack of statutory authority to remove, or even recommend the removal of, plaintiff from the work release program means that she did not have the requisite personal involvement to be liable to plaintiff for the violation of his procedural due process rights.  See id. ("DA Czajka could not have deprived Dubois of his license because he lacked the statutory authority to do so.").

Because it is undisputed that Woodberry's involvement in plaintiff's removal from work release was limited to her presiding over a disciplinary hearing which did not effectuate his removal, Woodberry's motion for summary judgment is granted.[5]

---

[5] Having granted Woodberry's motion for summary judgment, there are no remaining federal claims in this case.  Accordingly, this court lacks subject matter pursuant to 28 U.S.C. § 1331.  However, there is complete diversity of citizenship between the remaining parties, Microgenics and plaintiff, and the amount in controversy exceeds the jurisdictional amount specified in 28 U.S.C. § 1332.  Thus, the Court retains jurisdiction over this case pursuant to diversity jurisdiction.  See Wright v. Musanti, 887 F.3d 577, 585-86 (2d Cir. 2018); Philan Ins. Ltd. v. Frank B. Hall & Co., 786 F. Supp. 345, 348 (S.D.N.Y. 1992).

**CONCLUSION**

Microgenics' motions to exclude Swotinsky and for summary judgment are denied.

Woodberry's motion for summary judgment is granted.  By separate order, the Court will set this

matter down for trial on plaintiff's negligence claim against Microgenics.


**SO ORDERED.**

*Brian M. Cogan*
_____
U.S.D.J.


Dated: Brooklyn, New York
       August 1, 2025